NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| LAMMAR DAVID BURNEY,<br><br>              Appellant,<br><br>v.<br><br>STATE OF ALASKA,<br><br>              Appellee. | Court of Appeals No. A-13327<br>Trial Court No. 3AN-14-02889 CR<br><br><br>O P I N I O N |
| JAMAL KAREEM TOWNSEND,<br><br>              Appellant,<br><br>v.<br><br>STATE OF ALASKA,<br><br>              Appellee. | Court of Appeals No. A-13344<br>Trial Court No. 3AN-14-02888 CR<br><br><br><br>No. 2794 — January 3, 2025 |

Appeals from the Superior Court, Third Judicial District, Anchorage, Jack W. Smith and Erin B. Marston, Judges.

Appearances: Jane B. Martinez, Law Office of Jane B. Martinez, LLC, Anchorage, under contract with the Office of Public Advocacy, for Appellant Burney. Brooke Berens, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Appellant Townsend. Elizabeth T. Burke, Assistant Attorney General, Office of Criminal

Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Terrell, Judges.

Judge ALLARD, writing for the Court.
Judge TERRELL, concurring in part and dissenting in part.

Lammar David Burney and Jamal Kareem Townsend were convicted, under a theory of principal or accomplice liability, of first-degree murder for shooting into a darkened apartment window and killing a fifteen-year-old girl who was asleep in her bed.[1] Both defendants were also convicted, under a theory of principal or accomplice liability, of second-degree assault and second-degree weapons misconduct for conduct related to the shooting.[2] Townsend was also separately convicted of first-degree weapons misconduct for firing shots towards that same apartment eleven days prior to the murder.[3]

Both men now appeal, raising two claims of error. First, they argue that the trial court erred in failing to sever their cases based on their mutually antagonistic defenses. Second, they argue that the trial court erred in denying their motion for a new trial following a post-trial allegation of juror misconduct and jury tampering.

For the reasons explained in this opinion, we conclude that the trial court should have severed the cases based on the defendants' mutually antagonistic defenses. However, we also conclude, based on the overwhelming strength of the State's case for second-degree murder, that the error was prejudicial only as to the jury's guilty verdict

---

[1] AS 11.41.100(a)(1)(A). The jury also found Burney and Townsend guilty of second-degree murder, which merged with their convictions for first-degree murder.

[2] AS 11.41.210(a)(1) and AS 11.61.195(a)(3)(B), respectively.

[3] AS 11.61.190(a)(2).

for first-degree murder rather than second-degree murder. In other words, we conclude that the remedy for the trial court's failure to sever is limited to vacating the first-degree murder convictions and entering judgment for second-degree murder. Lastly, we conclude that the trial court erred in denying the defendants' motion for a new trial based on juror misconduct and jury tampering and that further proceedings are required to resolve that claim.

*Background facts*

We begin by presenting the underlying facts of this case. We note that the parties sometimes presented conflicting versions of events, which will be indicated where appropriate.

Fifteen-year-old P.A. was shot and killed while she was sleeping in her bedroom in the early morning hours of April 1, 2014. Eleven days earlier, on March 21, Townsend had gotten into a physical altercation with Quentin Hargrove, P.A.'s father, that ended with Townsend firing shots into the building where the family lived.

The altercation arose because Townsend's girlfriend, Desiree Rilatos, was unhappy with the marijuana that she had purchased from Hargrove. After Rilatos complained to Townsend that the marijuana she had purchased was just "stems," Townsend had Rilatos drive him back to the apartment building to confront Hargrove. When Hargrove refused to give Townsend his money back, the two men got into a physical fight in front of the apartment building. A crowd gathered to watch the fight.

Prior to fighting Hargrove, Townsend handed Rilatos a 10mm handgun that he was carrying. The two men grappled and traded punches and, according to Hargrove, Hargrove seemed to have the upper hand. Hargrove also testified that P.A. hit Townsend while Hargrove choked Townsend. However, Townsend testified that "nobody" won the fight.

After the fight ended, Rilatos gave the gun back to Townsend. As Rilatos and Townsend drove away, Townsend fired seven shots at the upper floor of the

apartment building. No one was hit, but several bullets struck the building. At trial, Townsend admitted that he fired the shots and he testified that his goal was to bring the police to the house.

Hargrove did not report the shooting because he did not want police attention. However, the next day, Hargrove posted on Facebook that he had beaten up Townsend, and that Townsend had shot at his kids. At trial, Townsend denied ever seeing the post. But Rilatos testified that Townsend and his family felt threatened by this incident. She also testified that Townsend was holed up for about a week at her apartment, and then at a Motel 6.

Eleven days later, Townsend was at a small party with his friend, Burney. The party was at the apartment Burney shared with his girlfriend, Karlie West. West later told a detective that, during the gathering at her apartment, "the boys were in the kitchen" talking about someone "doing something to [Townsend]." At trial, West testified that her impression was that Townsend wanted "to get back [at] them for doing what they did to him."

In the early morning hours of April 1, at around 3:00 a.m., Burney asked West for a ride. When West asked where he wanted to go, Burney said he needed her to take him somewhere but did not specify where. West could tell that Burney was drunk and she did not want him to drive her car while drunk, so she agreed. Burney then looked at Townsend and said, "Let's go." West later testified that Townsend said something like "right now?" — indicating that he was surprised when Burney said they were leaving.

Before they left the apartment, Burney went to the apartment's lower level (where the bathrooms and bedrooms were located) for a few minutes.[4] West drove the two men, with Townsend in the front passenger seat and Burney in the back seat.

---

[4] Townsend's attorney argued during closing that Burney went to retrieve a gun. The testimony at trial, however, was that it was Townsend who was known to carry a gun.

Townsend gave West directions to Mountain View. At trial, West testified that she was not told where they were going but she "figured out that it was obviously a trip for [Townsend] since he was the one giving [her] directions."

According to Townsend's testimony at trial, while they were in the car, Burney asked to see where the fight on March 21 took place. Townsend then directed them to the building and pointed out the apartment where Hargrove and his family lived. Security camera footage shows West's Jeep driving by the apartment four times: at 2:58 a.m., 3:03 a.m., 3:08 a.m., and 3:10 a.m. Townsend testified that, while in the car, Burney asked if there was anything in the apartment that could be taken. Townsend replied that the family did not have anything valuable. Burney then told West to stop the car.

What occurred over the next couple of minutes was the main subject of dispute at trial. Security camera footage suggested that only one man got out of the car. However, it was impossible to tell from the footage which man got out of the car and which man stayed in the car.

In her initial interview with the police, West said that both Burney and Townsend got out of the car. However, she later retracted this statement and told the police that only Burney got out of the car. She told the police that she had originally said that Townsend also got out of the car because it did not seem fair that her boyfriend would be the only one to get into trouble. She agreed that, in her mind, this was "[Townsend's] issue" or "[Townsend's] beef," and if Burney was going to get into trouble, "[Townsend] should get in trouble as well."

At trial, West was adamant that only Burney got out of the car. This testimony was consistent with Townsend's testimony. Townsend testified that Burney got out of the car, and he claimed that he did not know why Burney got out of the car or what Burney was going to do.

Burney did not testify at trial. However, when he was arrested, Burney told the police that he had passed out drunk in the back seat of the car, that he never got

out of the car, and that he only woke up when the officers pulled the car over. At trial, Burney's attorney argued that this version of events occurred and that Townsend, acting alone, had committed the shooting.

Although the identity of the man who got out of the car was disputed, it is undisputed that the man fired six gunshots in rapid succession through the basement apartment window. The apartment was dark and the window was closed with curtains that were slightly open. Two of the shots hit P.A. while she was asleep in her bed, killing her. Another minor, D.S., was also in the room and was shot in the foot.

Police officers in the area heard the shots. The police dispatch also received a 911 call at 3:14 a.m. reporting that shots had been fired through a window and that a girl had been shot. Responding officers found casings and bullet holes from six shots that had been fired from a .40 caliber pistol.

One of the officers who heard the shots saw West's Jeep pull out of a nearby alley shortly after the shots were fired. When the officers stopped the Jeep, West was driving, Townsend was in the front passenger seat, and Burney was in the rear driver's side seat. Townsend immediately told the officers that he had an outstanding warrant and that he had a small amount of marijuana in his pocket. He also texted his girlfriend that he was going to jail.

Burney, Townsend, and West gave conflicting and false statements to the officers about where they were coming from and where they were going. Townsend said he had just been picked up at his girlfriend's nearby house. West said they were going to pick up a friend at a party. Burney said they had been coming from Boniface Parkway, but he then changed his story to say he had been picked up on Muldoon Road. When an officer pressed Burney and said, "Your friend already said you guys were in Mountain View," Burney responded — without having been directly accused of any particular criminal act — "I had nothing to do with it." Burney also claimed not to know Townsend.

Townsend was taken into custody on the warrant. Burney and West were also taken into custody.

The officers searched the vehicle and found a .40 caliber pistol under the front passenger seat. At trial, there was testimony that the pistol, based on its orientation, was most likely placed under the seat from the back (Burney's location), but that it could have been placed there from the front (Townsend's location). West testified that Townsend passed something to Burney during the car ride, although she did not see what it was. West testified that it was possible that either Burney or Townsend had moved the gun under the seat and she did not notice at the time because she was driving.

West was interviewed multiple times by detectives from the Anchorage Police Department, and changed her story over time. As already mentioned, West initially told the detectives that both Burney and Townsend got out of the car, and she stuck to that version of events for two years. But after entering a plea agreement to manslaughter where she agreed to testify truthfully, West retracted this statement and told the police that only Burney got out of the car.

In his interview, Townsend denied involvement in the shooting, and said he had not gotten out of the Jeep. He did not incriminate Burney.

Burney told the officers that he did not know Townsend. As previously mentioned, he also told the officers that he was passed out drunk in the back seat of the car, that he never got out of the car, and that he woke up when the officers pulled the car over.

Burney and Townsend were charged, under a theory of principal or accomplice liability,[5] with first- and second-degree murder for the death of P.A.,[6] first-

---

[5]    AS 11.16.110(2).

[6]    AS 11.41.100(a)(1)(A) and AS 11.41.110(a)(1)-(2), respectively.

degree attempted murder and second-degree assault for the injury to D.S.,[7] and second-degree weapons misconduct for discharging a firearm in the direction of the apartment.[8] Both were individually charged with third-degree weapons misconduct,[9] but these charges were later dismissed. Townsend was also charged with first-degree weapons misconduct for the March 21 shooting incident.[10]

West was originally charged with second-degree murder, third-degree assault, and second-degree misconduct involving weapons. West ultimately pleaded guilty to manslaughter. Her plea agreement required her to testify truthfully at Burney and Townsend's trial.

*The pretrial motion to sever*

Two months before trial, Burney filed a motion to sever his case from Townsend's.[11] Burney argued that the men's defenses were "mutually exclusive" and "actually irreconcilable" because each man intended to argue that the other man got out of the car and acted alone in shooting into the apartment building window.[12] Burney

---

[7] AS 11.41.100(a)(1)(A) & AS 11.31.100(a) and AS 11.41.210(a)(1), respectively.

[8] AS 11.61.195(a)(3)(B).

[9] AS 11.61.200(a)(1).

[10] AS 11.61.190(a)(2).

[11] Burney also filed an earlier motion to sever, two years before trial. But that motion was based on the joinder of his case with Townsend's weapons charge arising from the March 21 incident, not their irreconcilable defenses, and therefore is not relevant to the issues presented on appeal.

[12] *See Miller v. State*, 778 P.2d 593, 595 (Alaska App. 1989) (internal citation omitted) ("[S]everance should be granted when the defenses are actually irreconcilable. Defenses are irreconcilable when they are 'mutually exclusive to the extent that one must be disbelieved if the other is to be believed[.]'" (quoting *Aldulbaqui v. State*, 728 P.2d 1211, 1219 (Alaska App. 1986))).

argued that the defenses were actually irreconcilable because "[i]n order for Jamal Townsend's defense to be believed Lam[m]ar Burney's defense must be disbelieved and vi[ce] versa."[13]

The State opposed the motion to sever, asserting that there was some conflicting evidence that both men got out of the car and participated in the shooting.[14] The State also argued that its position at trial would be that "Burney and Townsend are *both* guilty, either by personally committing the crime or by aiding and abetting the other." The State noted that Burney had not pointed to any evidence that could be admitted at a joint trial that would not be admitted at separate trials.

The trial court denied Burney's motion to sever "for the reasons set forth in the State's opposition." In a handwritten note on the order, the court acknowledged that West's testimony at trial "may be that only one person left the vehicle," but the court indicated its belief that "the evidence/witnesses may contradict that anticipated testimony."

*The first renewed motion to sever*

The first renewed motion to sever came in the middle of opening statements. The prosecutor's opening statement previewed the State's theory of the case: that both men planned the shooting together even though it was likely that only one man (Burney) got out of the car. Immediately following the prosecutor's opening, Townsend's attorney began his opening statement by stating the following:

---

[13] *Id.*

[14] There was some confusion prior to trial regarding whether D.S., the other person in the bedroom when the shooting occurred, had stated that he saw two men at the window that night. This statement would have been consistent with West's original statement to the police but inconsistent with West's trial testimony and with the security camera footage. Regardless, D.S. ultimately did not testify at trial.

> Ladies and gentlemen, there is a killer sitting amongst us in this courtroom. And it's not Jamal Townsend. The killer is Lammar Burney.

Townsend's attorney then went on to describe Townsend's version of events:

> In the early morning hours, about 3:00 in the morning, [Burney] went up, and with this gun fired — stood outside a window, and went bang, bang, bang, bang, bang, bang, drunk out of his mind, mad at the world, upset, whatever.

The attorney asserted that the victim P.A. "didn't have a chance," that Burney "snuffed out the life of [P.A.] like it was a cheap cigarette," and that Burney "shattered" the victim's family like a "tidal wave." The attorney further asserted that Burney had decided to do a home invasion, and that he brought a ski mask to conduct the invasion but then forgot it in the car:

> So what he decides to do is he's just so pissed off, so disgusted with the situation that he just walks up and just says — yeah, he's mad at the world, he's mad — he just says — striking out and he just says take that. He doesn't care. He doesn't care if there's people in there or not. And that's why it's murder. . . . He had a choice and what — instead he decided to take his disgust or whatever, drunk on ever — on her and just ripped the souls out of a lot of people. And he didn't care.

After Townsend's attorney finished his opening statement, the court adjourned for the day.[15]

The next day, Burney's attorney renewed his motion to sever, arguing that Townsend's opening statement demonstrated why the court needed to sever the cases. The court noted that it was under the impression that the State had a witness (D.S.) who would testify to seeing two men at the bedroom window, which was one of the reasons why it denied the pretrial motion to sever. The attorneys for both Burney and Townsend

---

[15] Burney's attorney objected only once on hearsay grounds during Townsend's opening statement.

correctly stated that no such evidence would be introduced. The trial court then stated that it was taking the renewed motion to sever under advisement.

In his opening statement, Burney's attorney disparaged the opening statement made by Townsend's attorney, referring to the attorney as "very passionate" and his version of events as "fantasy."

Townsend's attorney objected to these remarks, arguing that Burney's attorney was "making this personal." The trial court sustained the objection, and instructed Burney's attorney to "focus on a normal opening." Burney's attorney then proceeded with his opening statement, arguing that Townsend was the shooter because Townsend had the motive, the opportunity, the willingness, and the means to commit the crime. Burney's attorney emphasized the State's burden of proof beyond a reasonable doubt but then ended his opening statement as follows:

> Remember that from my perspective, the only person in this courtroom who gets the benefit of any and all reasonable doubts is Lammar Burney. If you do all that, in the end, you [will] find that Lammar Burney is not guilty.

*The defendants' renewed motions to sever*

The defense attorneys continued to seek severance multiple times during trial. At the end of the first week of trial, Townsend's attorney argued that his client's due process rights were being eroded by the joint trial because of the "tension" between Burney's and Townsend's defenses. Townsend's attorney also argued that the tension between the two defenses was only going to get worse as the trial proceeded, and that the trial would be "basically Armageddon" if one of the defendants decided to testify.

The court continued to take the severance motion under advisement, stating that the issue was "very close" and that it did not know what its ruling on the motion would be.

The defense attorneys subsequently renewed their motions to sever multiple times during Karlie West's testimony. Townsend's attorney argued that the

prosecutor's direct examination of West was abbreviated because the prosecutor was relying on the defense attorneys to elicit the most incriminating evidence against the other defendant. For example, the prosecutor did not ask West whether she felt threatened by Townsend and his family; instead, this information was elicited by Burney's attorney. The prosecutor acknowledged that he was trying the case differently than he would have if severance had been granted, but he asserted that there was ultimately no difference in the evidence that the jury heard.

The trial court continued to take the motion under advisement, noting that it still needed to see "what other evidence the State intend[ed] to offer."

### The court's ruling on the severance motion

The court finally ruled on the severance motion at the close of the State's evidence. In its ruling, the court recounted the evidence that had been admitted, and concluded that the same evidence would probably have been admitted if the cases had been severed. The court acknowledged that the two defendants had antagonistic defenses, but concluded that severance was not necessary because there was a "third alternative" — that both defendants were guilty, as the State argued. The court found "no prejudice to either defendant based on a joint trial of these facts," and denied the motion to sever.

### Burney's defense case

After the State rested, Burney's attorney called two witnesses. The first witness was a cousin of P.A.'s who was sleeping in the same room as P.A. and who testified that the lights in the bedroom were off when the shooting occurred. The second witness was an Alaska State Crime Lab forensic scientist who testified that Burney's blood alcohol content the afternoon after he was arrested was .029. The scientist also explained that retrograde extrapolation could be used to determine Burney's blood alcohol content at the time of the shooting. The forensic scientist agreed with Burney's

attorney that Burney's blood alcohol content at the time of the shooting could have been as high as .304.

*Townsend's defense case*

Townsend testified in his own defense. In his testimony, Townsend admitted to shooting the upper floor of the Hargrove apartment on March 21. He said that he fired the shots at the upper floor because he thought it was empty (the apartment had a "for rent" sign in the window). Townsend testified that he was not angry after the March 21 incident and that he bought marijuana the next day from a member of Hargrove and P.A.'s family.

Townsend testified that Burney and West were giving him a ride to his girlfriend's house in Mountain View. He said that Burney asked him where the "fight" had taken place. (Townsend also testified, somewhat contradictorily, that he never mentioned the March 21 incident to Burney.) According to Townsend, Burney asked if there was anything in the apartment that could be taken and Townsend responded that he did not think the family had anything to take.

Townsend testified that Burney got out of the car but Townsend did not think that he would do anything. When asked why he did not walk the four to five blocks to his girlfriend's apartment, Townsend testified that he "didn't want to mess up [his] shoes." Townsend had brand new white sneakers on and it was breakup season. Townsend testified that he did not hear any gunshots, and that they were playing music in the car. According to Townsend, Burney was calm when he returned to the car. Townsend testified that he suspected Burney had done something criminal when the police pulled over the car, and that after detectives told him that a girl had been killed, he thought Burney was to blame. Townsend stated that he did not tell the police that Burney got out of the car because he did not want to be a "snitch." Townsend denied ever talking about revenge or passing Burney a gun, and he reiterated that he had no idea what Burney planned to do after exiting the car.

Townsend was cross-examined by both the prosecutor and Burney's attorney about previous statements he had made and about the altercation on March 21. Townsend was also cross-examined by both the prosecutor and Burney's attorney about his drug dealing.

*The defendants' renewed motion to sever and closing arguments*

After Townsend rested his case, Burney's attorney renewed his motion to sever based on Townsend's testimony that Burney was the shooter. Townsend's attorney joined the renewed motion. The trial court denied the renewed motion to sever.

At the end of trial, the parties made their closing arguments. The State's closing argument discussed accomplice liability and how the jurors did not have to agree with each other about who pulled the trigger. The prosecutor argued, "By far the most likely scenario is that Jamal Townsend came up with the plan [and] Lammar Burney got out of the Jeep and fired the shots himself."

Burney's attorney argued that Burney was highly intoxicated and therefore could not have had the "conscious objective" to kill someone, and that Townsend had committed the shooting instead. He argued that West lied about Burney getting out of the car because she was afraid of Townsend. Burney's attorney also argued that the shooter could not have had the "conscious objective" to kill because they could not see into the window of the apartment.

Townsend's attorney asserted that Burney committed the shooting alone. The attorney argued that Burney retrieved a gun before leaving West's house, and that Burney "emptied the clip" when he shot into the apartment. The attorney argued that Burney knew that he would blame it on Townsend and that Burney was "going to ruin everyone's life." Townsend's attorney argued that "whatever happened in that car is not accomplice liability. You know, they were driving around. This man, Lammar Burney, just went nuts and he tried to pull off something and what happened was it was supposed

to be a robbery." The attorney also argued that the shooting was second-degree murder, not manslaughter, because "six shots really negates the manslaughter."

In rebuttal, Burney's attorney attacked Townsend's closing argument. Burney's attorney argued that Townsend's attorney was trying to distract the jury from the truth "because that's what he has to do. But don't let him do that."

The State's rebuttal argument focused on accomplice liability. The prosecutor argued the two men had to work together to commit the crime because Townsend had the motive and Burney was the one to get out of the car. According to the prosecutor, "This was a plan, this was an event, this was a process that required contributions from both of them and that's whichever one fired the shots at the end of the plan, they're both guilty." The prosecutor also pointed out that Townsend's attorney had said in his closing argument that the shooting was murder, not manslaughter.

After closing arguments, Burney renewed his motion to sever based on Townsend's closing. Townsend again joined the motion. The trial court denied the motion.

Following deliberations, the jury found Burney and Townsend guilty of first-degree murder, second-degree murder, second-degree assault, and second-degree weapons misconduct. The guilty verdicts for second-degree murder were merged with the guilty verdicts for first-degree murder for both defendants. Townsend was also convicted of first-degree weapons misconduct for the events on March 21.

*The post-verdict issue with the jury foreperson*

After the verdicts were read and the jury was dismissed, the jury foreperson approached the judge who had taken the verdicts (the judge who presided over trial was unavailable when the verdicts were returned). The jury foreperson, T.S., informed the judge that he had experienced what he believed was an attempt at jury

intimidation a week earlier, but he had not said anything before because "he did not want anything to distract the jury or mess up the trial."

An evidentiary hearing was held before the judge who presided over trial. T.S. testified that he was outside smoking with two women from the jury when a man that T.S. believed to be Townsend's brother approached him and lifted up his waistband as though trying to show the foreperson a firearm.[16] T.S. testified that he believed that the man's intent was to intimidate the jury. He testified that he did not feel personally threatened because "[he] spent most of [his] life in the military, and [he had] been around individuals like that quite a bit of the time." But somewhat conflictingly, T.S. later testified that the incident "intimidated" him.

T.S. acknowledged that the judge had instructed the jurors that they were to report any external contact with anyone involved with the case. He testified that he did not talk to anyone about the incident until the trial was over because nothing came of the incident and he did not want to delay the trial. He also testified, however, that he thought it was "important" to inform the judge about the incident after the trial was over. T.S. testified that the incident did not affect his deliberations.

Based on T.S.'s testimony, Burney and Townsend moved for a new trial, alleging juror misconduct, jury intimidation, and jury tampering. Following a second evidentiary hearing, a different judge denied the defendants' motion for a new trial, ruling that the encounter had been too "innocuous" to be prejudicial.

*Sentencing*

Burney was sentenced to 67 years to serve, with no time suspended. Townsend was sentenced to 87 years to serve, with no time suspended.

This appeal followed.

---

[16] On appeal, the parties appear to agree that whoever the man was, he was not Townsend's brother.

*The two issues on appeal*

Burney and Townsend raise two issues on appeal. They argue first that the trial court abused its discretion by failing to sever their cases and they assert that they were actually prejudiced by the failure to sever. Burney and Townsend argue second that the trial court abused its discretion when it denied their motion for a new trial based on the alleged jury tampering incident. We address each argument in turn.

*Why we conclude that the trial court should have severed the cases but nevertheless conclude that Burney and Townsend have not shown actual prejudice as to any conviction other than their convictions for first-degree murder*

We begin by describing the basic law governing joinder and severance. Alaska Criminal Rule 8 provides that "[t]wo or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction . . . constituting an offense or offenses."[17] There is no dispute that Burney and Townsend were properly charged together under Criminal Rule 8.

Alaska Criminal Rule 14, however, gives the trial court discretion to sever properly joined cases when the court concludes that joinder is unfairly prejudicial:

> If it appears that a defendant or the state is unfairly prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires.[18]

"This [C]ourt will only overturn a trial court's denial of a motion to sever if the defendant can show both an abuse of discretion and actual prejudice."[19]

---

[17] Alaska R. Crim. P. 8(b).

[18] Alaska R. Crim. P. 14.

[19] *Pease v. State*, 54 P.3d 316, 322 (Alaska App. 2002).

Burney and Townsend argue that the court was required to grant severance because their defenses were mutually exclusive. We have previously said that "[a]lthough antagonistic defenses do not ordinarily require severance, severance should be granted when the defenses are actually irreconcilable."[20] "Defenses are irreconcilable when they are 'mutually exclusive to the extent that one must be disbelieved if the other is to be believed.'"[21]

The joinder of defendants advocating mutually exclusive defenses can have a prejudicial effect on the fairness of a trial in a number of ways. Chief among them is the problem of the "second prosecutor."[22] As the Ninth Circuit explained:

> Defendants who accuse each other bring the effect of a second prosecutor into the case with respect to their codefendant. In order to zealously represent his client, each codefendant's counsel must do everything possible to convict the other defendant. The existence of this extra prosecutor is particularly troublesome because the defense counsel are not always held to the limitations and standards imposed on the government prosecutor. Opening statements

---

[20] *Miller v. State*, 778 P.2d 593, 595 (Alaska App. 1989) (citing *Abdulbaqui v. State*, 728 P.2d 1211, 1219 (Alaska App. 1986)).

[21] *Id.* (quoting *Abdulbaqui*, 728 P.2d at 1219); *see also United States v. Holcomb*, 797 F.2d 1320, 1324 (5th Cir. 1986) ("The prototypical example [of mutually exclusive defenses] is a trial in which each of two defendants claims innocence, seeking to prove instead that the other committed the crime.").

[22] *See, e.g.*, *Zafiro v. United States*, 506 U.S. 534, 543-44 (1993) (Stevens, J., concurring) ("Joinder is problematic in cases involving mutually antagonistic defenses because it may . . . introduce what is in effect a second prosecutor into a case, by turning each codefendant into the other's most forceful adversary."); *State v. Cavazos*, 94 So. 3d 870, 880-81 (La. App. 2012) ("A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the State." (citing *State v. Prudholm*, 446 So. 2d 729, 741 (La. 1984))); *State v. Kinkade*, 680 P.2d 801, 804 (Ariz. 1984) (en banc) (noting that a trial involving truly antagonistic defenses "is more of a contest between the defendants rather than between the defendants and the prosecution").

. . . can become a forum in which gruesome and outlandish tales are told about the exclusive guilt of the "other" defendant.[23]

There are also other benefits to the prosecution in a joint trial of defendants with mutually exclusive defenses. As the Ninth Circuit explained, "Joinder in these cases can make a complex case seem simple to the jury: convict them both."[24]

> The government's case becomes the only unified and consistent presentation. It presents the jury with a way to resolve the logical contradiction inherent in the defendants' positions. While the defendants' claims contradict each other, each claim individually acts to reinforce the government's case. The government is further benefited by the additive and profound effects of repetition. Each important point the government makes about a given defendant is echoed and reinforced by the codefendant's counsel.[25]

In *Miller v. State*, this Court identified two tests used by different jurisdictions for determining "when defenses are mutually exclusive and therefore irreconcilable."[26] In the first test, defenses are treated as irreconcilable "if the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his codefendant."[27] In the

---

[23]  *United States v. Tootick*, 952 F.2d 1078, 1082 (9th Cir. 1991); *see also State v. Sauls*, 356 N.W.2d 516, 518 (Iowa 1984) ("We think unfairness exists when the core of the defense of two defendants is that the other defendant committed the crime, and the State forces the defendants to stand trial together and convict each other.").

[24]  *Tootick*, 952 F.2d at 1082.

[25]  *Id.*; *see also* 2 Crim. Prac. Manual § 32:18 (2024) ("There is a great risk that a jury, when faced with two inconsistent, mutually exclusive defenses, may simply decide that both defendants must be lying.").

[26]  *Miller v. State*, 778 P.2d 593, 595 (Alaska App. 1989).

[27]  *Id.* at 595-96 (alteration in original) (quoting *United States v. Berkowitz*, 662 F.2d 1127, 1134 (5th Cir. 1981)) (collecting cases).

second test, defenses are irreconcilable "when the conflict between competing defenses is so great that it gives rise to 'a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both [defendants] are guilty.'"[28] Although *Miller* was decided more than three decades ago, these two tests are still in common usage today.[29] Indeed, a review of current case law reveals that there are jurisdictions that use both tests, in combination or interchangeably.[30]

We begin our analysis of this case with the first test articulated above: whether in order to believe "the core of testimony" offered on behalf of one defendant, the jury was necessarily required to disbelieve the testimony offered on behalf of the other. The core testimony offered on behalf of Burney, put simply, was that Townsend was the shooter and that Burney was drunk and asleep in the back seat. The core

---

[28]   *Id.* at 596 (alteration in original) (quoting *Rhone v. United States*, 365 F.2d 980, 981 (D.C. Cir. 1966)) (collecting cases).

[29]   *See, e.g.*, *State v. Bol*, 9 N.W.3d 783, 789-90 (Iowa App. 2023) (applying first test); *State v. Jaramillo*, 460 P.3d 321, 333-34 (Ariz. App. 2020) (applying first test); *People v. Daveggio*, 415 P.3d 717, 741 (Cal. 2018) (applying second test); *State v. Emery*, 278 P.3d 653, 660 (Wash. 2012) (en banc) (applying second test).

[30]   *See, e.g.*, *United States v. Chavez*, 894 F.3d 593, 606 (4th Cir. 2018) (holding that severance is required for antagonistic defenses if there is "such a stark contrast presented by the defenses that the jury is presented with the proposition that to believe the core of one defense it must disbelieve the core of the other, or that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty" (quoting *United States v. Lighty*, 616 F.3d 321, 348-49 (4th Cir. 2010))); *United States v. Hawkins*, 796 F.3d 843, 861 (8th Cir. 2015) (applying both tests when evaluating whether co-defendants' defense theories were "irreconcilable or prejudicially antagonistic"); *People v. Colon*, 113 N.Y.S.3d 389, 393 (N.Y. App. Div. 2019) ("By seeking to implicate each other, [the co-defendants'] defenses were clearly antagonistic, mutually exclusive and irreconcilable, and created 'a significant possibility that the jury unjustifiably concluded by virtue of the conflict itself that both defenses were incredible and gave undue weight to the [State's] evidence.'" (quoting *People v. Mahboubian*, 543 N.E.2d 34, 40 (N.Y. 1989))).

testimony offered on behalf of Townsend was the opposite — that Burney was the shooter and that Townsend was neither aware of nor shared Burney's plan.

It is obvious that these two defenses are irreconcilable in the sense that in order to believe one defendant, the jury was necessarily required to disbelieve the other. In other words, to acquit Burney, the jury would have to believe that Townsend was the shooter and that he acted alone, and to acquit Townsend, the jury would have to believe that Burney was the shooter and that he acted alone.

The State argues that Burney's and Townsend's defenses were not mutually exclusive because Burney did not testify or directly claim that Townsend was the shooter, and because, "at least in theory," the jury could have reconciled Burney's and Townsend's versions of events by acquitting them both.[31] According to the State, the jury could have believed *both* "that Burney left the SUV as Townsend claimed (perhaps 'to take a piss' as Townsend suggested during his police interview) *and* that Burney was being truthful about his lack of participation in the murder but was simply too drunk to remember that he left the vehicle briefly to relieve himself."

The State's argument is flawed for two reasons. First, as the State acknowledges, this version of events would be "highly implausible" given the rest of the evidence presented at trial. There is nothing in the record to support a theory of a third unknown shooter. To the contrary, the State introduced forensic evidence at trial that showed that the bullets that killed P.A. were fired from the gun found under Townsend's seat in the car.

Second, it does not matter that Burney largely denied involvement, rather than directly accusing Townsend. As the Ninth Circuit observed in *United States v. Tootick*, "Mutual exclusivity may exist when only one defendant accuses the other, and

---

[31] *Cf. Commonwealth v. Ramos*, 25 N.E.3d 849, 858 (Mass. 2015) (explaining that defenses were not mutually exclusive because "[a]cceptance of [the co-defendant's] defense . . . would not have precluded acquittal of the defendant," but rather "could have led to the conclusion that the defendant, too, should be acquitted").

the other denies any involvement."[32] A defendant's denial of any involvement constitutes an accusation of their co-defendant when the facts are "closed in a fashion that does not suggest the intervention of some unknown actor."[33]

The situation in *Tootick* is similar to what occurred in this case. There, Tootick was tried jointly with his co-defendant for an assault resulting in serious bodily harm.[34] Tootick (like Burney) argued that he was "highly intoxicated" and either "asleep" or "passed out" when the assault occurred.[35] Conversely, Tootick's co-defendant (like Townsend) argued that Tootick "surprise[d]" him by committing the assault while the co-defendant remained in the car, "watch[ing] in horror."[36]

In holding that the defenses were mutually exclusive, the Ninth Circuit explained that, because Tootick and his co-defendant were the only people present when the attack occurred, and because there was no evidence suggesting the victim attacked himself, "[e]ach defense theory contradicted the other in such a way that the acquittal of one necessitate[d] the conviction of the other."[37] That is, the jury could have only acquitted Tootick by disbelieving his co-defendant's defense.

Here, as in *Tootick*, Burney's denial of any involvement in the shooting made his defense mutually exclusive of Townsend's because there was no credible evidence that any person other than Burney or Townsend was the shooter. Thus, to acquit Burney, the jury would have to believe that Townsend was the shooter (and that

---

[32] *United States v. Tootick*, 952 F.2d 1078, 1081 (9th Cir. 1991) (internal quotations omitted) (quoting *United States v. Romanello*, 726 F.2d 173, 177 (5th Cir. 1984)).

[33] *Id.*

[34] *Id.* at 1080.

[35] *Id.* at 1081.

[36] *Id.*

[37] *Id.*

Townsend acted alone). Alternatively, to acquit Townsend, the jury would have to believe that Burney was the shooter (and that Burney acted alone). In other words, to believe one defense, the jury would have to disbelieve the other defense.

The State argues that any conflict between Burney's defense and Townsend's defense does not matter because the jury had a third option — to convict them both under the State's aiding and abetting theory. We agree that there is support in the case law for the proposition that the strength of the State's aiding and abetting case can help mitigate the prejudice that mutually exclusive defenses can otherwise create.[38] Courts have therefore affirmed a trial court's failure to sever defendants with allegedly mutually exclusive defenses in cases where the State's evidence of both defendants' guilt was particularly strong.[39]

The case law from other jurisdictions further establishes that mutually exclusive defenses are not prejudicial *per se*.[40] In *Tootick*, the Ninth Circuit concluded that the defendants had mutually exclusive defenses because "[e]ach defense theory

---

[38]  *Miller v. State*, 778 P.2d 593, 596 (Alaska App. 1989) (noting that "the prosecution presented compelling evidence indicating that [the defendants] both actively participated in the murder," making it "unlikely that the jury would have viewed this as a case in which the 'conflict alone demonstrate[d] that both defendants [were] guilty'" (quoting *Rhone v. United States*, 365 F.2d 980, 981 (D.C. Cir. 1966))); *People v. Winbush*, 387 P.3d 1187, 1229 (Cal. 2017) ("If the moving party's guilt can be established by sufficient independent evidence, 'it is not the conflict alone that demonstrates . . . guilt,' and severance is not required." (quoting *People v. Coffman*, 96 P.3d 30, 41 (Cal. 2004))); *People v. Hana*, 524 N.W.2d 682, 697 (Mich. 1994) (internal citation omitted) ("The risk of prejudice is reduced even more in these cases by the significant fact that the prosecutor charged defendant . . . as an aider and abettor and did not contend that he fired the fatal shot.").

[39]  *See, e.g.*, *Miller*, 778 P.2d at 596; *Hana*, 524 N.W.2d at 697; *see also Ex parte Hardy*, 804 So. 2d 298, 304-05 (Ala. 2000) (noting that although it was "judicially risky" for the court not to sever co-defendants with mutually antagonistic defenses, the joint trial ultimately did not prejudice Hardy because of the strength of the State's case).

[40]  *See, e.g.*, *Zafiro v. United States*, 506 U.S. 534, 538 (1993); *Tootick*, 952 F.2d at 1083.

contradicted the other in such a way that the acquittal of one necessitate[d] the conviction of the other."[41] But the Ninth Circuit rejected the defendants' argument that a finding of mutually exclusive defenses necessarily required reversal of their convictions on appeal.[42] Instead, the court noted that reversal of a decision denying severance was appropriate only when the defendant proves they suffered "clear, manifest, or undue prejudice from the joint trial."[43] The court ultimately concluded that the defendants in *Tootick* had demonstrated clear and manifest prejudice because the court determined, based on the "number and types of prejudicial incidents that were not corrected by instructions from the court," that the jury "[w]ould not have been able to assess the guilt or innocence of the defendants on an individual and independent basis."[44]

The Ninth Circuit's rejection of a *per se* prejudice standard in *Tootick* preceded the United States Supreme Court's 1993 decision in *Zafiro v. United States*.[45] In *Zafiro*, the Supreme Court similarly rejected a *per se* prejudice rule for mutually exclusive defenses and instead held that severance was mandated (and reversal was required) "only if there is a serious risk that a joint trial would compromise a specific

---

[41]  *Tootick*, 952 F.2d at 1081.

[42]  *Id.* at 1083.

[43]  *Id.* (cleaned up) (quoting *United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir. 1980)); *see also Abdulbaqui v. State*, 728 P.2d 1211, 1219 (Alaska App. 1986) ("A trial court's decision to deny severance can be overturned only for an abuse of discretion and only where there has been a showing of prejudice." (internal citation omitted)); *Potts v. State*, 2020 WL 362699, at *2 (Alaska App. Jan. 22, 2020) (unpublished) (same).

[44]  *Tootick*, 952 F.2d at 1083.

[45]  *Zafiro*, 506 U.S. 534.

trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."[46]

The *Zafiro* test is similar to the second test identified in *Miller*. Under that test, severance is mandated "when the conflict between competing defenses is so great that it gives rise to 'a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both [defendants] are guilty.'"[47]

On appeal, the State argues that the second *Miller* test is not satisfied because the State "presented overwhelming evidence that Burney and Townsend were both participants in the shooting, regardless of who pulled the trigger." Thus, according to the State, it was not the "conflict alone" that demonstrated both defendants were guilty, but rather the strength of the State's evidence that the defendants acted in concert.

We agree with the State that it presented overwhelming evidence that Burney and Townsend acted in concert. It was undisputed at trial that Burney had no reason to target Hargrove's family, and that it was only Townsend who had any kind of motive to cause them harm. As the prosecutor observed during closing argument, what happened does not make much sense unless there was some sort of plan between the two men to seek retaliation for the events of March 21. In other words, the evidence does not support the conclusion that Townsend was the shooter, but it also does not support the conclusion that Burney would act on his own to harm a family that he had no "beef" with.

There was also significant evidence presented that there was some sort of retaliatory plan in action. West testified that Townsend was talking about getting back at Hargrove, and she testified that her impression was that Burney and Townsend were

---

[46] *Id.* at 538-39.

[47] *Miller v. State*, 778 P.2d 593, 596 (Alaska App. 1989) (alteration in original) (quoting *Rhone v. United States*, 365 F.2d 980, 981 (D.C. Cir. 1966)) (collecting cases).

looking for retaliation. West also testified that Townsend passed something to Burney before Burney got out of the car, and that while Townsend was known to carry a gun, she had never known Burney to carry a gun.

That said, while the State's evidence for some form of homicide was strong, its evidence for first-degree murder (the highest charge for which both defendants were convicted) was far from overwhelming. A person commits first-degree murder under AS 11.41.100(a)(1)(A) if, "with intent to cause the death of another person, the person . . . causes the death of any person."[48] A person acts "intentionally" with respect to a result when the person's "conscious objective is to cause that result."[49] In other words, to prove that the shooter was guilty of first-degree murder, the State was required to prove beyond a reasonable doubt that the shooter's conscious objective as he shot into the darkened basement apartment window was to kill a person.

But there was relatively little evidence introduced at trial to support such an inference. Although the dissent speculates that the shooter could see into the window and was targeting the king-size bed inside the room, there was no clear evidence that the shooter could see into the room that early morning. To the contrary, the testimony at trial was that the curtains were at least partially drawn and the lights in the room were off.

Moreover, there was evidence at trial that Burney was unfamiliar with the apartment and the family who lived in it, so there was relatively little reason to believe that (assuming Burney was the shooter) he knew he was shooting into a bedroom.[50]

---

[48] AS 11.41.100(a)(1)(A).

[49] AS 11.81.900(a)(1).

[50] The dissent speculates that Townsend may have been aware that the basement window looked into a bedroom from his past visits to the apartment, but there was no evidence that Townsend ever communicated such knowledge to Burney.

There was also evidence that Burney was highly intoxicated, arguably making him incapable of forming an intent to kill.[51]

The evidence for first-degree murder under an accomplice theory was even weaker. To prove first-degree murder under an accomplice theory, the State was required to prove, beyond a reasonable doubt, that the person remaining in the car "solicited, encouraged, or assisted" the shooter "with the intent to promote or facilitate" the intentional killing of another person.[52] That is, assuming Burney was the shooter, the State had to prove that Townsend aided or abetted Burney with the specific intent that Burney would kill a person. But, while there was evidence of a retaliatory plan, there was no evidence of an actual plan to kill someone. There was little in West's testimony or any of the other evidence at trial to suggest that the two men actually conspired to kill someone.

Certainly, there was strong evidence that the two men seemingly did not care whether their actions killed someone. There is little question that shooting six bullets into a darkened basement window in the middle of the night constitutes the extreme indifference to human life that is the hallmark of second-degree murder.[53] But

---

[51] Although voluntary intoxication is not a defense to crimes with a knowing or reckless *mens rea*, like second-degree murder, it is a defense to first-degree murder, which requires proof beyond a reasonable doubt of the specific intent to kill. AS 11.81.630 ("Voluntary intoxication is not a defense to a prosecution for an offense, but evidence that the defendant was intoxicated may be offered whenever it is relevant to negate an element of the offense that requires that the defendant intentionally cause a result."); *see also Santillana v. State*, 1999 WL 1260851, at *4 (Alaska App. Nov. 17, 1999) (Mannheimer, J., concurring) (unpublished) ("Voluntary intoxication *is* a defense if the crime requires proof that the defendant acted 'intentionally' with respect to a result.").

[52] *Riley v. State*, 60 P.3d 204, 207 (Alaska App. 2002); *see also* AS 11.16.110(2)(A).

[53] AS 11.41.110(a)(2). We note that, in addition to the extreme indifference theory, the grand jury also indicted Burney and Townsend on second-degree murder under the theory that they engaged in conduct "substantially certain to cause death or serious physical

there was relatively little evidence from which to discern a specific intent to kill, particularly with regard to the accomplice who did not leave the car.

The dissent argues that a reasonable juror could nevertheless conclude that both men committed first-degree murder based on the totality of circumstances, including the number of bullets and Townsend's retaliatory motive. The dissent also cites to cases where first-degree murder convictions have been upheld against legal sufficiency challenges. But the relevant question is not whether the evidence was legally sufficient to convict on charges of first-degree murder, but rather whether the joint trial resulted in prejudice. We do not disagree that the evidence is legally sufficient to support a first-degree murder conviction, and the State is thus entitled to retry the defendants for first-degree murder if it wishes. Instead, the question is one of prejudice — whether there is reason to believe that the jury's decision to convict on the first-degree murder charges, despite the absence of any strong evidence of an intent to kill, was influenced by the overt antagonism generated by the defendant's mutually exclusive defenses.

In his treatise on criminal law, Professor LaFave refers to the joint trial of defendants who truly have antagonistic defenses as "most unfair," and he states that the remedy of severance is needed to prevent the kind of trial described by one appellate court as follows:

> The trial was in many respects more of a contest between the defendants than between the people and the defendants. It produced a spectacle where the people frequently stood by and witnessed a combat in which the defendants attempted to destroy each other.[54]

---

injury." AS 11.41.110(a)(1). In a subsequent information replacing indictment, however, the State dropped this theory.

54   5 Wayne R. LaFave et al., *Criminal Procedure* § 17.2(d) (4th ed. 2024) (quoting *People v. Braune*, 2 N.E.2d 839, 842 (Ill. 1936)).

Courts have therefore reversed convictions in cases where the co-defendant's counsel acts as "an overly aggressive adversary . . . , in effect becoming a second prosecutor."[55] The Illinois Supreme Court put it aptly: "Where one defendant accuses his codefendant, an antagonism arises which requires separate trials; otherwise, the alternative is a 'circus.'"[56]

Here, the fear that a joint trial of defendants with mutually exclusive defenses could devolve into a "spectacle" or a "circus" was at least partially realized. Both defense attorneys engaged in aggressive tactics that a prosecutor would not have been permitted to engage in. Townsend's attorney began his opening statement with the outlandish declaration that Burney was a "killer," and much of his argument was an attack on Burney's character.[57] For his part, Burney's attorney derided Townsend's

---

[55] *People v. Forbes*, 203 A.D.2d 609, 612 (N.Y. App. Div. 1994) ("The record demonstrates that Roberts' counsel was an overly aggressive adversary toward defendant throughout, in effect becoming a second prosecutor. We find under these circumstances that there was a 'significant possibility that the jury unjustifiably concluded by virtue of the conflict itself that both defenses were incredible and gave undue weight to the government's evidence' and that it was therefore error to have ordered a joint trial." (citations omitted) (quoting *People v. Mahboubian*, 74 N.Y.2d 174, 186 (N.Y. 1989))); *see also People v. McGuire*, 148 A.D.3d 1578, 1579-80 (N.Y. App. Div. 2017) (reversing convictions "because the codefendants' respective attorneys 'took an aggressive adversarial stance against [defendant at trial], in effect becoming a second [and a third] prosecutor'" (alteration in original) (quoting *People v. Cardwell*, 78 N.Y.2d 996, 998 (N.Y. 1991))); *State v. Jaramillo*, 460 P.3d 321, 329-30 (Ariz. App. 2020) (reversing convictions and noting that jury instructions requiring the jury to treat each defendant separately "provides no remedy for the primary harm arising from co-defendants presenting antagonistic defenses: defendants are forced to defend against two adverse parties rather than one").

[56] *People v. Byron*, 506 N.E.2d 1247, 1251 (Ill. 1987) (citing *Braune*, 2 N.E.2d at 840-41).

[57] *See, e.g.*, *People v. Bean*, 485 N.E.2d 349, 355 (Ill. 1985) ("[The co-defendant's] trial strategy of depicting [the defendant] as the 'murderer' and of producing testimony damaging to [him] which was not elicited by the State from its own witnesses unfairly

opening statement as "fantasy," and repeatedly emphasized Townsend's drug dealing and how dangerous Townsend was.

When evidentiary issues arose, the two defense attorneys were more aggressive than the prosecutor in seeking to have prejudicial evidence admitted, and some of the most incriminating evidence at trial was elicited by the other defense attorney rather than the prosecutor. The State meanwhile obtained the unfair benefit of having a second prosecutor help litigate its case, and was able to take advantage of the fact that both defense attorneys spent so much time trying to make the other defendant appear unlikable and dangerous.

At the same time, although it is true that the defense attorneys were frequently at "loggerheads" with one another, we do not find that the trial devolved into the "Armageddon" that the attorneys warned of. For the most part, the same evidence was admitted at the joint trial that could have been admitted at separate trials, and the theatrics were mainly limited to the opening statements and some parts of the closing arguments. We also note that when Burney's attorney began using inflammatory language in his opening statement, Townsend's attorney objected, and Burney's attorney was instructed to stay within the bounds of a "normal" opening statement, which he largely did. In contrast, Burney's attorney only objected once to Townsend's opening statement (on hearsay grounds) even though it was Townsend's attorney who engaged in the more outlandish rhetoric during opening statement.

This is a difficult case to resolve. On the one hand, there were clear grounds to sever the case based on the mutually exclusive defenses, and it certainly would not have been an abuse of discretion for the trial court to grant the pretrial motion even before the potential problems associated with the second prosecutor became

---

placed [him] in the position of having to defend against two accusers, the State and his codefendant.").

apparent.[58] On the other hand, the strength of the State's case makes it questionable whether the defendants were actually prejudiced by the joint trial. As we have explained, to obtain reversal based on a failure to sever, defendants must show not only that the trial court should have severed their cases (*i.e.*, abused its discretion), but also that the failure to do so resulted in actual prejudice.[59]

Here, we conclude that the only actual prejudice that Burney and Townsend have shown is that the mutual antagonism demonstrated by the defense attorneys may have unfairly influenced the jury to convict Burney and Townsend of first-degree murder when the evidence for first-degree murder (as opposed to second-degree murder) was relatively weak.[60] Thus, if there were no other issues in this case, we would vacate Burney's and Townsend's convictions for first-degree murder and remand the case to the superior court to allow for either a retrial on the first-degree murder charges, if the State so elects, or entry of judgment on the second-degree murder charges and resentencing.

However, before such a remand can take place, we must first address the other issue on appeal related to the allegations of jury tampering and juror intimidation.

---

[58]   *Cf.* 5 Wayne R. LaFave et al., *Criminal Procedure* § 17.2(g) (4th ed. 2024) (noting the problem with severance requests is that it is "difficult to ascertain the degree of prejudice in advance of trial" and that "once the trial is under way there is great reluctance to grant a severance").

[59]   *Abdulbaqui v. State*, 728 P.2d 1211, 1219 (Alaska App. 1986) ("A trial court's decision to deny severance can be overturned only for abuse of discretion and only where there has been a showing of prejudice." (internal citation omitted)); *see also People v. Coffman*, 96 P.3d 30, 64 (Cal. 2004) ("Even if a trial court abuses its discretion in failing to grant severance, reversal is required only upon a showing that, to a reasonable probability, the defendant would have received a more favorable result in a separate trial.").

[60]   *Jaramillo*, 460 P.3d at 338 (reversing convictions for failure to sever mutually antagonistic defenses because evidence against defendant, while "substantial," was not "overwhelming").

*Additional details about the alleged jury tampering and juror intimidation*

On the day that the jury reached its verdicts, the trial judge, Superior Court Judge Jack Smith, was unavailable. A different judge, Superior Court Judge Patrick McKay, presided over the return of the verdicts.

Judge McKay later sent Judge Smith an email about an off-the-record exchange he had with the jury foreperson, T.S., after the verdicts were returned. The email stated:

> [T]he foreperson, [T.S.], pulled me aside and recounted an instance which occurred a week ago yesterday, 9/28/17, in which a brother/family member of one of the defendants (I did not ask which defendant) approached him while outside the courthouse on a break. The person made a gesture that [T.S.] felt could indicate that the person was armed. [T.S.] indicated he did not feel concern for his own safety and made a conscious decision not to report the encounter. My understanding is that he reported it to no one, not even other jury members until after the verdict. He relayed to me that he did not want anything to distract the jury or mess up the trial.

Judge Smith informed the parties of this email and scheduled an evidentiary hearing so that T.S. could be questioned under oath about what he experienced.

At the evidentiary hearing, T.S. testified that an individual approached him while he was outside smoking with two other jurors. T.S. believed that the individual was Townsend's brother because, during trial, one of the attorneys identified where Townsend's family was sitting. T.S.'s initial impression was that the man "was trying to show [T.S.] something that he had in his waistband." T.S. testified that, in response, he first made sure the two female jurors smoking with him were out of harm's way and then "stepped forward in an attempt to block anything that might be coming of it." T.S. testified that his attention was focused on the man's hands because he was worried that he had a gun. But T.S. testified that he did not feel personally threatened

from the encounter because he spent "most of [his] life in the military" and had "been around individuals like that quite a bit of the time." T.S. denied telling any other jurors what had happened.

T.S. was then questioned by the court and the defense attorneys. In response to a question from the court, T.S. testified that the event did not impact his evaluation of the evidence with regard to either defendant.[61] In response to questioning by the defense attorneys, T.S. elaborated on his perception of this encounter and its aftermath.

T.S. confirmed that his impression was that the man was "trying to intimidate" him about what his decision in the case was going to be. He testified that the incident did not affect his decisions in any way, even "unconsciously."[62] T.S. testified that he did not report the incident to anyone at the time because "it came of nothing so [he] didn't do anything about it." However, he testified that after the trial was over, he thought it was "important" to tell the judge what happened. T.S. testified that during the encounter, he never "felt threatened" although he did feel "intimidated." In response to a defense attorney's question about whether T.S. thought that jury tampering could "mess up" the trial, T.S. stated that he did not know what the man's

---

[61] As the trial court later acknowledged, it was improper for the court to ask the juror about the effect of the incident on his deliberations. *See Swain v. State*, 817 P.2d 927, 932 (Alaska App. 1991) (recognizing that under the plain language of Alaska Evidence Rule 606(b), "jurors may be questioned only as to whether extraneous matters were brought to their attention, and not as to what the effect of any such matter may have been [on their deliberations]"); *Larson v. State*, 79 P.3d 650, 654 (Alaska App. 2003) (recognizing that Alaska Evidence Rule 606(b) "bars juror testimony and affidavits offered to prove the *effect* of these events on the jurors' mental processes").

[62] This answer was in response to a question from the defense attorney about whether T.S. had been "unconsciously" affected by the event. As explained, it was improper under Alaska Evidence Rule 606(b) to ask T.S. about whether the incident directly affected his deliberations.

intention was, but he acknowledged that the jury had been instructed to report any external contact with anyone involved in the case.

At the conclusion of the evidentiary hearing, Judge Smith invited the parties to submit written briefing on what should happen next. Burney filed a motion for a new trial alleging juror misconduct, jury intimidation, and jury tampering, which Townsend joined. They argued that a presumption of prejudice attached under federal law to this type of threatening contact with a juror. And they both argued that no weight should be given to T.S.'s testimony that the incident had no effect on his deliberations because Alaska case law required the court to assess the effect of such an encounter objectively, from the perspective of a reasonable juror.[63]

Judge Smith subsequently distributed a handwritten note to the parties indicating that it had been improper to ask the juror whether the incident had an effect on his deliberations, noting that the law required an objective assessment of how a reasonable person in the juror's position could have been affected.

In briefing that Townsend filed after this hearing, he noted that had the juror reported this contact when it occurred, as he was required to do under the court's instructions, steps could have been taken to limit any prejudicial effect.[64] Townsend requested that the court hold a second evidentiary hearing so that the two female jurors present during the incident could be questioned to determine whether they had any knowledge of what had occurred.

---

[63] *See Swain*, 817 P.2d at 932-33 (noting that Evidence Rule 606(b) prohibits juror testimony from being offered to prove "the effect of any matter or statement upon [that juror's] or any other juror's mind or emotions as influencing [the juror] to ascent to or dissent from the verdict" (internal citation and quotations omitted)).

[64] *Cf. United States v. Cheek*, 94 F.3d 136, 144 (4th Cir. 1996) ("We cannot condone [the juror's] decision not to report immediately the extrajudicial contact to the trial judge as instructed. . . . Had he told the judge what he told [a friend], an alternate juror could have been substituted . . . [and] [t]he cloud on the verdict that this extrajudicial contact caused would not exist.").

Judge Smith granted Townsend's request for an evidentiary hearing, but did not personally preside over this hearing. Instead, the second evidentiary hearing occurred before a new judge, Superior Court Judge Erin Marston.[65] Four different female jurors who the parties believed may have been present during the encounter were called to testify. The hearing confirmed that none of these women had heard or seen anything, and that T.S. had not discussed the incident with any of them.

Judge Marston subsequently issued a written order denying the motion for a new trial. In the order, Judge Marston characterized T.S.'s testimony from the first evidentiary hearing (which Judge Smith had presided over) as follows:

> The third party contact was described as lasting just a couple of seconds. No words were exchanged and the juror did not report any subsequent attempts at contact or recall seeing the individual in the courtroom again after that day. The entirety of the contact was described as an individual approaching the juror outside of the courthouse and pulling up their jacket in a way that displayed their waistband. The juror did not report actually seeing any weapons when the third party made the motion. Furthermore, the juror's own testimony regarding how he interpreted the contact is somewhat conflicting. The juror stated he did not feel threatened, but also stated he was intimidated or at the least thought the action was meant to intimidate him. Then in yet another response, the juror said he thought it was just another encounter and was unsure of the other individual's intentions.

Based on this characterization, Judge Marston ruled that "the encounter was not sufficient to present a credible risk of influencing the verdict." The judge concluded that "[u]nder an objective analysis, the contact was so short and the conduct by the third party was such an innocuous gesture [that] the court believes there is no

---

[65]  It is not clear why Judge Smith did not preside over the second evidentiary hearing and why Judge Smith did not issue the ruling on the motions for a new trial. The record indicates that Judge Smith retired soon after but he was nevertheless brought back to preside over Burney's and Townsend's sentencings.

credible risk that an objective and typical juror would have been influenced by the contact." The judge therefore concluded that the contact did not "trigger a presumption of prejudice," as the defense attorneys claimed. The judge also ruled, in the alternative, that even if a presumption of prejudice was triggered, the State had rebutted that presumption by conclusively establishing that there was "no reasonable possibility" that the encounter had any effect on the jury's verdict.

Judge Marston also rejected the defense attorneys' argument that the foreperson had not reported the contact because he did not want to risk being removed from the jury. Instead, the judge concluded that T.S.'s explanation that he did not report the incident because he did not want to delay the trial was plausible.


*Why we conclude that a remand for further proceedings is required*

The Sixth Amendment of the United States Constitution and Article I, Section 11 of the Alaska Constitution guarantee a criminal defendant the right to be tried before an impartial jury.[66]

To help safeguard this right, the United States Supreme Court, in *Remmer v. United States*, created a rebuttable presumption of prejudice that applies to contacts or communications between third parties and jurors concerning the matter pending before the jury.[67] Thus, when faced with certain allegations of improper contact between a juror and an outside party, most federal courts apply a settled two-step framework:

---

[66] U.S. Const. amend. VI; Alaska Const. art. I, § 11; *see also Godoy v. Spearman*, 861 F.3d 956, 958 (9th Cir. 2017) ("One of the most fundamental rights in our system of criminal justice is the right to trial before an impartial jury.").

[67] *Remmer v. United States (Remmer I)*, 347 U.S. 227, 229 (1954); *see also Mattox v. United States*, 146 U.S. 140, 150 (1892), ("Private communications, possibly prejudicial, between jurors and third persons, . . . are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear.").

At step one, the court asks whether the contact was "possibly prejudicial," meaning it had a "tendency" to be "injurious to the defendant." If so, the contact is "deemed presumptively prejudicial" and the court proceeds to step two, where the "burden rests heavily upon the [state] to establish" the contact was, in fact, "harmless." If the state does not show harmlessness, the court must grant the defendant a new trial.[68]

The first step presents a "low threshold."[69] A defendant cannot rely merely on "'[t]hreadbare or speculative allegations' of misconduct" or "'allegations involving prosaic kinds of jury misconduct,' such as 'chance contacts between witnesses and jury members'" (as when passing in a hallway or in an elevator).[70] But the defendant need only present "evidence of an external contact that has a 'tendency' to be 'injurious to the defendant.'"[71] In order to trigger the presumption of prejudice, the contact need only "raise a credible risk of influencing the verdict."[72]

Courts have held that a suspected incident of jury tampering necessarily raises a presumption of prejudice under *Remmer*.[73] As the Ninth Circuit explained in

---

[68]   *Godoy*, 861 F.3d at 959 (internal citations omitted). *But see United States v. Lawson*, 677 F.3d 629, 643-44 (4th Cir. 2012) (discussing circuit split with regard to whether the *Remmer* presumption still applies following later Supreme Court caselaw).

[69]   *Godoy*, 861 F.3d. at 967 (quoting *Tarango v. McDaniel*, 837 F.3d 936, 949 (9th Cir. 2016)).

[70]   *Id.* (citations omitted) (quoting *Tarango*, 837 F.3d at 947, 951).

[71]   *Id.* (quoting *Tarango*, 837 F.3d at 947).

[72]   *Id.* (quoting *Tarango*, 837 F.3d at 947).

[73]   *See, e.g.*, *United States v. Henley*, 238 F.3d 1111, 1115 (9th Cir. 2001) ("Since the *Remmer* cases, it has been clear that jury tampering creates a presumption of prejudice and that the government carries the heavy burden of rebutting that presumption."); *United States v. Dutkel*, 192 F.3d 893, 894 (9th Cir. 1999); *see also Remmer I*, 347 U.S. 227, 229 (1954) ("In a criminal case, any . . . tampering directly or indirectly[] with a juror during a

*United States v. Dutkel*, "Because jury tampering cuts to the heart of the Sixth Amendment's promise of a fair trial, [courts] treat jury tampering cases very differently from other cases of jury misconduct."[74] There are a number of concerns that arise from an incident of suspected jury tampering. As the trial court noted, there is the possibility that the juror's actions could be influenced by fear or resentment.[75] There is also concern that the incident may have been distracting and may have prevented the juror "from thinking about the evidence or paying attention to the judge's instructions."[76] And there is a concern that the incident may have affected the juror's actions and demeanor during deliberations.[77] Thus, as a general matter, "[o]nce tampering is established, [courts will] presume prejudice and put a heavy burden on the government to rebut the presumption."[78]

In the current case, the trial court ruled that the presumption of prejudice did not apply because it found that T.S.'s contact with the unknown man was so "innocuous" that it presented "no credible risk that an objective and typical juror would have been influenced by the contact." Burney and Townsend argue that in reaching this

---

trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial[.]").

[74] *Dutkel*, 192 F.3d at 894.

[75] *See id.* at 897 ("Where the intrusion is (or is suspected to be) on behalf of the defendant raising the claim of prejudice, the presumption arises automatically because jurors will not doubt resent a defendant they believe has made an improper approach to them.").

[76] *Henley*, 238 F.3d at 1117.

[77] *Remmer v. United States* (*Remmer II*), 350 U.S. 377, 381 (1956) (expressing concern that the alleged tampering may have affected the juror's "freedom of action").

[78] *Dutkel*, 192 F.3d at 894.

conclusion the trial court mischaracterized the nature of the third-party contact. We agree.

In its order, the trial court focused primarily on what it viewed had "objective[ly]" occurred, concluding that the encounter involved little more than a man "pulling up their jacket in a way that displayed their waistband." The State does the same on appeal, arguing that the encounter may have been nothing more than a man "adjusting his jacket" or "pulling up his pants."

But the central flaw with this reasoning is that it does not account for T.S.'s own understanding of what occurred. While it may be true that T.S. was mistaken about the identity of the man, the fact remains that T.S. apparently believed that the man was Townsend's brother.[79] Thus, T.S. entered into deliberations under the impression — accurate or not — that Townsend's brother had tried to intimidate him.[80] The same is true with regard to the presence of a gun. While one might doubt whether the man actually had a gun, the fact remains that T.S. was worried that the man might have had a gun.[81]

---

[79]  *See United States v. Rutherford*, 371 F.3d 634, 642-43 (9th Cir. 2004) (explaining that in determining whether the presumption of prejudice should apply, courts do not look to the intent of the individual alleged to have tampered with the jury, but rather to the jurors' perceptions of the conduct at issue").

[80]  *See id.* at 641-43 (recognizing that the presence of a large number of IRS agents and other government agents at trial that were allegedly glaring at the jury may have intimidated the jury even if that was not the agents' intentions); *United States v. Angulo*, 4 F.3d 843, 846-47 (9th Cir. 1993) (noting that the jurors' perception of an anonymous phone call was the relevant consideration rather than the actual intent of the caller).

[81]  *See, e.g.*, *United States v. Cheek*, 94 F.3d 136, 142 (4th Cir. 1996) (noting that the facts that the juror never saw any money, that no money was offered to him, and that he was not threatened were relevant but did not negate the presumption of prejudice that attached to an incident of suspected jury tampering).

The trial court's focus on the "objective" evidence of what occurred appears to be based on a misreading of this Court's holding in *Swain v. State*.[82] In *Swain*, we held that a trial court should not inquire into a juror's subjective assessment of the effect that potentially prejudicial external contact may have had on their deliberations.[83] Instead, the test for prejudice is an objective one.[84] The question is how such a contact would likely have affected the deliberations of an objectively reasonable juror.[85]

But while *Swain* prohibits a trial court from considering a juror's post-verdict assessment of whether an external contact influenced their deliberations, it does not prohibit a trial court from considering a juror's subjective assessment of the *nature* of the external contact.[86] Indeed, it would be impossible for a trial court to apply the objective "reasonable juror" *Swain* test without first determining what the juror actually experienced.

Accordingly, the trial court erred when it viewed the encounter as entirely "innocuous." Instead, the court was required to consider T.S.'s own subjective understanding of what had occurred. T.S.'s subjective view was that he had experienced an apparent incident of juror intimidation by a man he believed to be Townsend's brother. Under federal law, the *Remmer* presumption of prejudice attaches to a suspected incident of jury tampering if the contact has a "credible risk of influencing the verdict."[87] In the present case, T.S.'s testimony that he believed Townsend's brother

---

[82] *Swain v. State*, 817 P.2d 927 (Alaska App. 1991).

[83] *Id.* at 933.

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Godoy v. Spearman*, 861 F.3d 956, 967 (9th Cir. 2017) (internal quotations omitted) (quoting *Tarango v. McDaniel*, 837 F.3d 936, 947 (9th Cir. 2016)).

was trying to intimidate him as a juror was more than sufficient to meet this "low threshold."[88]

Having established that the first step of the *Remmer* test was met, we turn to the second step — whether the State can rebut the presumption of prejudice that arises when an incident of suspected jury tampering has occurred. As the United States Supreme Court made clear in its sequel to *Remmer* (*Remmer II*), this assessment requires the court to examine the "entire picture" for harmlessness, including the factual circumstances and the impact of the event on the juror.[89] "Harmlessness in this context means 'that there is no reasonable possibility that the communication . . . influence[d] the verdict.'"[90]

On appeal, Burney and Townsend argue that the State failed to rebut the presumption of prejudice because, according to them, an objective, reasonable juror would necessarily have had their deliberations impacted by an incident of suspected jury tampering. But the facts here are not so simple.

In *Remmer II*, the United States Supreme Court reversed the defendant's convictions and granted a new trial because it concluded that, based on the totality of the evidence, the State had not rebutted the presumption of prejudice.[91] Central to its decision, however, was the fact that the juror testified that he felt he was under "terrific

---

[88]  *Tarango*, 837 F.3d at 949.

[89]  *Remmer II*, 350 U.S. 377, 379 (1956); *see also United States v. Cheek*, 94 F.3d 136, 143 (4th Cir. 1996) (noting that a "probing factual inquiry" is necessary in these situations, although Federal Evidence Rule 606(b) precludes "all inquiry into a juror's mental process in connection with the verdict" (quoting *Haley v. Blue Ridge Transfer Co., Inc.*, 802 F.2d 1532, 1535 n.1 (4th Cir. 1986))).

[90]  *Godoy*, 861 F.3d at 968 (quoting *Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 697 (9th Cir. 2004)).

[91]  *Remmer II*, 350 U.S. at 382.

pressure" as a result of the tampering incident and subsequent FBI investigation.[92] That is, the Court found that it was "quite evident" from the juror's testimony that he was a "disturbed and troubled man from the date of the [extrajudicial] contact until after trial."[93] Other courts have likewise emphasized that incidents of suspected jury tampering left jurors "devastated and fearful"[94] or "extremely scared."[95]

Here, the testimony is more conflicting. Although T.S. testified that he felt "intimidated" by the encounter, he also testified that he did not feel personally threatened because of his military background. Likewise, while he testified that he viewed the encounter as an attempt to intimidate him as a juror, he also testified that he did not actually know the man's intentions, and that he did not report it because it was "just another encounter" and "it came of nothing." T.S. also denied feeling "on edge" because of the incident.

Typically, when there is conflicting testimony at an evidentiary hearing, we look to the trial court to resolve the conflict because the trial court is in the best position to evaluate the witness's affect and demeanor and to come to a conclusion as to what really happened.[96] But here, we have the added complication that the judge who

---

[92]  *Id.* at 381.

[93]  *Id.*

[94]  *Cheek*, 94 F.3d at 140, 144 (juror testified that he did not report an incident of suspected jury tampering because he was "very afraid of retaliation by the defendants").

[95]  *United States v. Henley*, 238 F.3d 1111, 1116 (9th Cir. 2001) (juror testified that he was "extremely scared"); *see also United States v. Elias*, 269 F.3d 1003, 1019-21 (9th Cir. 2001) (affirming the trial court's denial of a motion for a new trial where the defendant asked a juror "what it would take to buy her off" because the jurors testified at an evidentiary hearing that they believed the defendant was joking).

[96]  *See Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 178 (Alaska 2009) ("[Appellate courts] grant especially great deference when the trial court's factual findings require weighing the credibility of witnesses and conflicting oral testimony." (citing *Vezey v. Green*, 171 P.3d 1125, 1128-29 (Alaska 2007))).

heard T.S.'s testimony is not the judge who rendered the decision on the defendants' motion for a new trial. The judge issuing the order was therefore not well positioned to resolve the conflicting testimony, and he did not do so, instead simply noting that there was conflicting testimony.

There are also other errors in the trial court's order. Although the judge who conducted the evidentiary hearing later issued an order acknowledging that he could not consider T.S.'s testimony that the encounter had not affected his deliberations, the judge who ultimately ruled on the motion for a new trial referred to this fact twice in his order and appeared, at least in part, to rely on it in his analysis.

Both federal and state law are clear that a court cannot consider a juror's post-verdict reassurances that an external contact did not affect their deliberations. This prohibition is derived from Evidence Rule 606(b), which is similar under both federal and state law.[97] As we explained in *Larson v. State*:

> Evidence Rule 606(b) declares that juror testimony and juror affidavits can not be offered for any of these purposes: (1) to prove "any matter or statement occurring during the course of the jury's deliberations", or (2) to prove "the effect of any matter or statement upon that [juror's] or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict", or (3) to prove "the juror's mental processes in connection therewith" [*i.e.*, in connection with the juror's decision to assent to or dissent from the verdict].[98]

Evidence Rule 606(b) contains two exceptions to the prohibition against considering a juror's post-verdict statements about the jury's deliberations.[99] First, juror

---

[97]  *Compare* Fed. R. Evid. 606(b), *with* Alaska R. Evid. 606(b); *see also Swain v. State*, 817 P.2d 927, 932 (Alaska App. 1991) (observing that Alaska Evidence Rule 606(b) was modeled after Federal Evidence Rule 606(b)).

[98]  *Larson v. State*, 79 P.3d 650, 653 (Alaska App. 2003).

[99]  Although not relevant to this case, we note that the United States Supreme Court has created an additional exception to Evidence Rule 606(b) for discriminatory conduct.

testimony and affidavits are allowed with regard to "whether extraneous prejudicial information was improperly brought to the jury's attention."[100] Second, juror testimony and affidavits are allowed with regard to "whether any outside influence was improperly brought to bear upon any juror."[101] In other words, a court can consider juror testimony "to prove or disprove the *occurrence* of" extraneous prejudicial information or outside influences, but it cannot consider post-verdict[102] juror testimony "when offered to prove the *effect* of these events" on the jurors' deliberative processes.[103]

Applying Evidence Rule 606(b) and its exceptions to the current case, the court was permitted to consider T.S.'s testimony regarding the nature of the outside influence that he experienced — *i.e.*, his testimony about what he perceived had occurred during the encounter outside the courthouse. The court was prohibited,

---

*See, e.g.*, *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 211, 225 (2017) (holding that the Evidence Rule 606(b) "no impeachment rule" gives way "where a juror makes a clear statement that indicates he or she relied on racial stereotypes of animus to convict a criminal defendant").

[100] Alaska R. Evid. 606(b); *see also Larson*, 79 P.3d at 654.

[101] *Larson*, 79 P.3d at 654.

[102] We note that the prohibitions under Evidence Rule 606(b) do not apply *before* the jury begins its deliberations. As we explained in *Larson v. State*, "The rule prohibits the use of juror testimony and juror affidavits in 'an inquiry into the validity of the verdict,' but it does not restrict the use of this evidence when the court investigates potential juror misconduct before the jury renders its decision." *Larson*, 79 P.3d at 653; *see also Waters v. State*, 1993 WL 13156700, at *4, n.1 (Alaska App. May 26, 1993) (unpublished) (explaining that "*Swain* and the authorities it relied on dealt exclusively with situations involving retrospective inquiries into the effects of potentially prejudicial extrinsic information on verdicts that had already been rendered").

[103] *Larson*, 79 P.3d at 654 (citing *Swain v. State*, 817 P.2d 927, 932-33 (Alaska App. 1991)); *see also United States v. Cheek*, 94 F.3d 136, 143 (4th Cir. 1996) ("[W]hen a party seeks to attack or support a verdict, Rule 606(b) prohibits all inquiry into a juror's mental process in connection with the verdict." (citing *Tanner v. United States*, 483 U.S. 107, 117-22 (1987))).

2794

however, from considering T.S.'s testimony about the effect, if any, that this encounter had on his deliberations — *i.e.*, his testimony that the encounter did not impact his deliberations either "consciously or unconsciously."

But what about T.S.'s testimony that he did not feel threatened because of his military background and his testimony that he was not "on edge" because of the encounter? Can this testimony be considered under Evidence Rule 606(b)? We acknowledge that there is some language in our cases that suggests that Evidence Rule 606(b) precludes any consideration of the effect of an external encounter on the juror's "mental processes."[104] But if that language is traced back to its origin in federal law, it is clear that the prohibition applies only to "mental processes" as they relate to a juror's *deliberations*.[105]

Indeed, federal law is quite clear on this matter. In *United States v. Rutherford*, for example, the Ninth Circuit stated:

> [A] juror cannot testify to whether an outside influence *caused* him to change his vote from innocent to guilty. However, a court can and should consider the "effect of

---

[104] *See, e.g.*, *Swain*, 817 P.2d at 932-33 (describing *Ciervo v. State*, 756 P.2d 907 (Alaska App. 1988), as mistaken and stating that there is a wealth of authority holding that a reviewing court "is precluded from considering evidence concerning the subjective impact of the extraneous matter"); *Larson*, 79 P.3d at 654 (stating Evidence Rule 606(b) "bars juror testimony and affidavits when offered to prove the effect of [extraneous prejudicial information or outside influences] on the jurors' mental processes").

[105] *See Swain*, 817 P.2d at 932-34 (explaining that prohibition is based on Evidence Rule 606(b) and related federal case law and clarifying that *Ciervo* is disavowed "to the extent that it suggests that courts may properly consider evidence of the actual, subjective impact of extraneous prejudicial matter *on a juror's deliberations*" (emphasis added)); *Larson*, 79 P.3d at 653 (clarifying that Evidence Rule 606(b) prohibits inquiring into jurors' "mental processes in connection therewith [*i.e.*, in *connection with the juror's decision to assent to or dissent from the verdict*]" (emphasis added) (citing to *Tanner v. United States*, 483 U.S. 107 (1987))); *see also Tanner*, 483 U.S. at 138, (Marshall, J., dissenting) (noting that Evidence Rule 606(b)'s prohibition against eliciting testimony regarding the effect on the juror's "mental processes" is limited to "the 'mental processes' of the juror in connection with his 'assent to or dissent from the verdict.'").

extraneous information or improper contacts on a juror's state of mind," a juror's "general fear and anxiety following" such an incident, and any other thoughts a juror might have about the contacts or conduct at issue.[106]

The court further explained:

> In this regard, a juror's testimony concerning his fear that individuals would retaliate against him if he voted to acquit (or convict) would be admissible, although his statement that he actually cast his vote one way or the other because of that fear would not.[107]

Similarly, in *United States v. Henley*, the Ninth Circuit distinguished between "testimony regarding the affected juror's mental processes in reaching the verdict," which is barred by Rule 606(b), and "testimony regarding the juror's more general fear and anxiety following a tampering incident, which is admissible for purposes of determining whether there is a 'reasonable possibility that the extraneous contact affected the verdict.'"[108]

We therefore conclude that for purposes of determining whether the State can rebut the presumption of prejudice established under *Remmer*, the trial court is entitled to consider testimony regarding how T.S. was (or was not) emotionally affected by the third-party contact, although it cannot consider testimony regarding the effect (or lack of effect) that the contact may have had on T.S.'s deliberative processes.

Lastly, we note that our analysis has focused on the *Remmer* test and its application to this case because that is the test on which the parties focused in the superior court and the test on which the superior court relied. On appeal, Burney and

---

[106] *United States v. Rutherford*, 371 F.3d 634, 644 (9th Cir. 2004) (quoting *United States v. Elias*, 269 F.3d 1003, 1020 (9th Cir. 2001)).

[107] *Id.* (citing *United States v. Dutkel*, 192 F.3d 893, 898 (9th Cir. 1999)).

[108] *United States v. Henley*, 238 F.3d 1111, 1118 (9th Cir. 2001) (quoting *Cheek*, 94 F.3d at 144).

Townsend argue that they are also entitled to relief under the state tests for jury misconduct. As we recently explained, there are two lines of cases in our case law that set out two slightly different standards for "jury misconduct" — a term that is used both to describe "action by jurors that is contrary to their responsibilities and conduct by others which contaminates the jury process with extraneous influence."[109]

The first test — which addresses misconduct committed by the juror — depends on a two-part test:

> First, the evidence must establish a serious violation of the juror's duty — *i.e.*, fraud, bribery, forcible coercion, or any obstruction of justice. Second, the violation must deprive a party of a fair trial — which may be shown by three factors: (1) whether the juror would have been challenged for cause had the juror disclosed the relevant information; (2) whether the misconduct went to a collateral or material issue; and (3) whether the probable effect of the misconduct was prejudicial.[110]

The State argues that Burney and Townsend have waived reliance on this test by failing to argue the test in their trial court pleadings and failing to obtain a ruling from the trial court. We agree. A review of the pleadings before the trial court shows that although Burney and Townsend argued generically that T.S.'s failure to immediately notify the court of the encounter with the man T.S. believed to be Townsend's brother constituted "jury misconduct," they never articulated or argued any

---

[109] *Antoghame v. State*, 2023 WL 29317, at *2 (Alaska App. Jan. 4, 2023) (unpublished) (quoting 6 Wayne R. LaFave et al., *Criminal Procedure*, § 24.9(f), at 688-89 (4th ed. 2015)).

[110] *Id.* (first citing *West v. State*, 409 P.2d 847, 852 (Alaska 1966); then citing *Fickes v. Petrolane-Alaska Gas Serv., Inc.*, 628 P.2d 908, 910 (Alaska 1981)).

legal standard by which to evaluate such alleged misconduct and they never obtained any ruling on that issue from the trial court.[111]

The second test — which addresses when a juror has been exposed to material outside the trial record — requires the court to grant a new trial when "the court finds a substantial likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself."[112] This test is similar to the *Remmer* test in that it deals with contacts and communications between third parties and jurors. But it is seemingly less protective than *Remmer* because it does not employ a presumption of prejudice standard. Instead, the burden is on the defendant to establish a "substantial likelihood" that the vote of one or more jurors was affected by the third-party contact.[113]

As a general matter, a state constitutional test cannot be less protective than its federal counterpart.[114] It therefore makes sense, in the context of this case where a presumption of prejudice under the *Remmer* test has been established, to continue to use the more protective *Remmer* test on remand, particularly given the fact that this was the only test briefed and argued by the parties in the trial court proceedings.

We therefore remand this case to the trial court for further proceedings to give the State an opportunity to rebut the presumption of prejudice under *Remmer*. If, upon completion of those proceedings, the trial court concludes that the verdicts were tainted, then the judgments of conviction shall be set aside and a new trial may be

---

[111] *See Marino v. State*, 934 P.2d 1321, 1327 (Alaska App. 1997) (failure to obtain a trial court ruling on an issue waives that claim for appeal).

[112] *Swain v. State*, 817 P.2d 927, 931 (Alaska App. 1991).

[113] *Id.*

[114] *Fletcher v. State*, 532 P.3d 286, 307 (Alaska App. 2023) ("[U]nder the principles of federalism, the Alaska Constitution must be at least as protective as its federal counterpart." (citing *Doe v. State, Dep't of Pub. Safety*, 92 P.3d 398, 404 (Alaska 2004)))

conducted, if the State so elects. If the court determines that the State has rebutted the presumption of prejudice, however, the judgments of conviction (other than for first-degree murder) shall remain.

*Conclusion*

For the reasons explained in this opinion, we VACATE Burney's and Townsend's convictions for first-degree murder. We also VACATE the superior court's order denying defendants' motion for a new trial and REMAND for further proceedings consistent with this opinion. On remand, the superior court shall conduct a new evidentiary hearing, as appropriate, and enter a new order on defendants' motion for a new trial. Thereafter, the superior court may conduct a retrial, if required, or enter judgment on Burney's and Townsend's second-degree murder convictions and proceed to a resentencing. We retain jurisdiction.

Judge TERRELL, concurring in part and dissenting in part.

The majority concludes that the trial court should have granted appellants' motions to sever their cases for trial, while concluding that the denial of severance was not prejudicial as to the charge of second-degree murder but that it was prejudicial as to the charge of first-degree murder. I do not agree that the trial court should have severed the cases, but because the court reaches the correct resolution with respect to the second-degree murder charge, I concur in the result as to that charge. I dissent from both the majority's analysis and resolution as to the first-degree murder charge.

As to the first-degree murder charge, the majority takes the view that the State's case for intentional homicide was "far from overwhelming," and that the evidence of this case more strongly supports a second-degree murder conviction under the theory that the shooter was so reckless as to the possibility that his acts would cause death that it amounted to acting with extreme indifference to the value of human life.[1] The majority concludes that the fact that the jury convicted both Burney and Townsend of first-degree murder suggests that the jury may have been influenced to find guilt on the higher charge due to the antagonistic nature of their defenses, as exemplified by the rhetoric of defense counsel, who both strenuously argued that their client's co-defendant was the real culprit. I disagree with this assessment. The State's case provided a cohesive and unifying theory and solid evidentiary basis for the jury to convict both Burney and Townsend of first-degree murder. In these circumstances the trial court did not abuse its discretion in denying severance.[2]

---

[1]  *See* AS 11.41.110(a)(2) ("A person commits the crime of murder in the second degree if . . . the person knowingly engages in conduct that results in the death of another person under circumstances manifesting an extreme indifference to the value of human life."); *see also Jeffries v. State*, 169 P.3d 913, 916 (Alaska 2007) (explaining the culpable mental states applicable to AS 11.41.110(a)(2)).

[2]  *See Middleton v. State*, 577 P.2d 1050, 1052, 1054-55 (Alaska 1977).

My discussion of the case is laid out as follows. First, I will discuss some preliminary points about the nature of first-degree murder, and why the facts of this case map onto the requirements for first-degree murder. Second, I will discuss why the State put forth a solid first-degree murder case. Finally, I will conclude with some brief thoughts about the standards and considerations that should be applied by trial judges when evaluating motions to sever co-defendants' cases based on antagonistic defenses.

Beginning with first-degree murder, Alaska's first-degree murder statute, AS 11.41.100, requires the State to prove that the defendant acted "with intent to cause the death of another person."[3] But as we have recognized, this statute "does not require the State to prove that a defendant had a specific intent to cause the death *of a particular person* to convict the defendant of murder."[4] Thus it is sufficient, for example, if the defendant intended to kill at the first opportunity any person who was a member of a particular group, or any person in a particular location (such as a person that the defendant knows is standing behind a door that he is shooting into). It is true that shooting at a generalized target can often fit the definitions of the two main theories of second-degree murder: causing death while either (1) acting "with intent to cause serious physical injury to another person or knowing that the conduct is substantially certain to cause death or serious physical injury," or (2) "knowingly engag[ing] in conduct that results in the death of another person under circumstances manifesting an extreme indifference to the value of human life."[5] But the circumstances of such a

---

[3]   AS 11.41.100(a)(1).

[4]   *Ramsey v. State*, 56 P.3d 675, 681 (Alaska App. 2002) (emphasis added). This is in accord with the majority view of the nature of intentional homicide. *See, e.g.*, *People v. Stone*, 205 P.3d 272, 277 (Cal. 2009) ("The requisite intent, therefore, is the intent to kill *a*, not a specific, human being."); 40 C.J.S. *Homicide* § 81 (2024) ("[A]n intent to kill need not be directed toward any specific person, and a conditional intent to kill, if carried into effect on the occurrence of the condition, is sufficient." (cited cases omitted)).

[5]   AS 11.41.110(a)(1)-(2).

shooting can sometimes provide the basis to conclude that the shooter intended to kill and thus committed first-degree murder.[6] Courts have recognized some factors that can provide the basis to find a shooter's intent to kill include firing numerous shots into a targeted area of a room, at a level or height most likely to hit a person, at a time when it is substantially likely that persons will be in the targeted area.[7] These factors have converged in retaliatory shooting cases where the defendant seeks retribution for a past harm, allowing a jury to infer intent.[8]

---

[6]     *Id.* The legislative commentary to this statute gives "[s]hooting into a crowded room without an intent to cause death or serious physical injury" as "an example of an act done with knowledge that death or serious physical injury is substantially certain to result." Senate Journal Supp. No. 47, at 9-10 (June 12, 1978). It gives "shooting through a tent under circumstances where the defendant did not know a person was inside" as an example of an extreme-indifference second-degree murder under paragraph (a)(2). *Id.* In the two above examples of shooting into an enclosed structure constituting second-degree murder, the difference between paragraphs (a)(1) and (a)(2) is the actor's knowledge that the building is occupied, but the difference which elevates it to first-degree murder is the *intent* to kill a person that the shooter knows is inside the building. And it is important to note that under Alaska law, absolute certainty is not a requirement for a defendant to act "knowingly." Alaska Statute 11.81.900(a)(2) provides in relevant part that "when knowledge of the existence of a particular fact is an element of an offense, that knowledge is established if a person is aware of a substantial probability of its existence."

[7]     *See, e.g.*, *Tackett v. Trierweiler*, 956 F.3d 358, 368-69 (6th Cir. 2020) (noting all these facts, and noting a conclusion that the shooting was intentional was supported because it appeared to be in retaliation for a previous incident); *Washington v. State*, 376 P.3d 802, 808 (Nev. 2016) (driving to a populated area with a handgun and firing multiple shots into an apartment building at 4:35 a.m. supported jury's finding that the defendant acted deliberately); *State v. Betancourt*, 342 P.3d 916, 931 (Kan. 2015) ("[T]he evidence viewed in the light most favorable to the State provides evidence Betancourt shot in a pattern designed to hit someone standing on the other side of the door."). We have likewise recognized that, in the case of homicides, "intent 'may be inferred from the circumstances attending the killing.'" *Howell v. State*, 917 P.2d 1202, 1212 (Alaska App. 1996) (cited and quoted cases omitted).

[8]     *See, e.g.*, *Tackett*, 956 F.3d at 368-69; *Betancourt*, 342 P.3d at 921.

The State argued from the outset that Burney and Townsend had not necessarily set out to kill a specific individual, but rather targeted members of the Hargrove household.[9] In the State's opening statement, immediately after referring to the death of P.A. as a "targeted killing," the prosecutor asked a rhetorical question, "Why would these two men target this residence for an execution?" In describing the conversation at West's house about retaliation, the prosecutor stated that "this is where the two are talking about how Mr. Townsend had been stolen from and disrespected by this family." The prosecutor described West's statements to police that "she overheard Mr. Townsend telling Mr. Burney about how these people had robbed him, stolen from him, jumped him," and stated that "[t]hey both agreed on a plan to retaliate to get back at the people who had jumped, stolen from, and disrespected Mr. Townsend." The prosecutor again referred to the Hargrove apartment as the "targeted residence."

I turn now to discuss my differences with the majority as to the strength of the State's first-degree murder case. The record provided a solid basis from which a reasonable juror could conclude that the State had proved that Burney and Townsend committed first-degree murder.

---

[9]    This was consistent with the evidence, discussed in greater detail below, that Townsend had reason to have animus against others, not just Hargrove, but also a broader group within the Hargrove household. Not only had Hargrove fought with Townsend and supposedly ripped Townsend off in the marijuana deal, but Demetra Alex, P.A.'s mother, was, in Townsend's view, a participant in the rip-off and had seriously insulted Townsend's girlfriend, Rilatos. Moreover, two teenagers associated with the household, including P.A., had jumped on Townsend and hit him during the fight with Hargrove. Alex testified that after the fight, Townsend had complained that "*y'all* trying to jump people." Townsend stated during a police interview that "*they* jumped me . . . and took my money." Rilatos also testified that after the fight "they" (*i.e.*, presumably the Hargrove/Alex family) threatened to harm Townsend's family. If Townsend thought his family was being threatened, it appears logical that he could have concluded that retaliation against not only Hargrove but also the key members of the Hargrove household who had acted against Townsend was appropriate.

The evidence and circumstances surrounding the shooting supported the view that the shooter intended to kill. The shooter used a lethal, .40 caliber semi-automatic handgun and fired numerous (six) shots in a relatively tight pattern, as evidenced by the holes in the bedroom window, downward into a target zone in the bedroom in a location where persons were substantially likely to be, *i.e.*, in the king-size bed.[10] The trial exhibits show that the bed was directly facing the window.[11] Three of the six shots hit the two persons in the bed, P.A. and D.S. (two shots hitting P.A. and one shot hitting D.S.). Burney and Townsend point to testimony that the lights were off in the room when the shots were fired and that the window had curtains. However, the .40 caliber gun found in West's Jeep had a laser sight or an attached flashlight, and the testimony and physical evidence supported the view that the curtains were partially open and had a gap that the shooter could see through. Given all of these facts, a reasonable juror could conclude that the shooter knew that he was shooting at persons inside the bedroom and intended to kill them.

The majority asserts that I am speculating that the shooter could see into the room, stating that "there was no clear evidence that the shooter could see into the room that early morning," and that "the testimony at trial was that the curtains were at

---

[10]  Townsend had recently been inside the Hargrove apartment on multiple occasions, to both buy marijuana from Hargrove and to smoke it with him in Hargrove and Alex's bedroom, which was next to P.A.'s bedroom, and knew which bedroom was which. Hargrove and Alex's bedroom windows were covered in tinfoil to block light, and thus was distinguishable from P.A.'s bedroom from outside the apartment building. Alex testified that "if you walk by my bedroom, you could see everything in [P.A.'s] room." Trial exhibits support her testimony. Therefore, Townsend no doubt knew the general area to fire into P.A's bedroom to hit a person, and could communicate that to Burney.

[11]  Alex testified that the bed had recently been moved (from being directly underneath the outside window to the opposite side of the room). But, as previously noted, the bed was king-sized, and, as seen in the trial exhibits, even assuming that the shooter thought that the bed was against the outside window, the "strike zone" for hitting a person in the room on that bed would still have been roughly the same.

least partially drawn and the lights in the room were off." Demetra Alex testified that the curtains for that window, even when fully drawn, did not fully cover the window and left a gap, such that someone standing outside the window could see the bed. She stated at trial that this gap would be four to five inches. But the record provides several other critical pieces of evidence that reveal that, at the time of the shooting, the curtains had been pushed apart substantially further than four to five inches. The window covering consisted of two separate curtains suspended from a curtain rod. When looking from inside the apartment, the curtain hanging on the right side has no bullet holes in it, meaning that it was not covering the lateral pattern in which the six bullet holes were spaced.[12] As to the curtain hanging on the left side, the trial testimony was that it had only two defects in it from bullet holes. However, early crime scene photos taken from outside the building show this curtain pulled across the window in front of where most of the six bullet holes are concentrated, but without obvious perforations in the curtain corresponding to all the bullet holes. An officer who was at the scene speculated at trial that, based on the holes in the window and the limited defects in the curtain, "more of the room was exposed" at the time of the shooting and that, after the shots were fired, the curtain had been pulled. Moreover, as previously noted, the gun had a laser sight or flashlight attached. The evidence provided a clear basis from which jurors could conclude the shooter could see into the room and knew that he was shooting at people.

Additionally, although motive is technically not something the State is required to prove, the jury in this case had been presented with strong evidence that Townsend had a substantial motive to retaliate against Hargrove and Alex. The majority's description of the facts of the March 21 drug-deal-gone-bad is somewhat cursory and so I will describe it here in greater detail.

---

[12] The curtains were removed and examined by the police, and brought into court as an exhibit that the jurors could see for themselves.

Townsend, by his own admission, was a small-time drug dealer. Townsend wanted to make some money by buying an ounce of marijuana from Hargrove and then reselling it, but was out of money. To cover the cost, he directed his girlfriend, Rilatos, to go to the Hargrove apartment in Mountain View and buy an ounce of marijuana from Hargrove for $350 and said that he would reimburse her later. Hargrove was away when Rilatos arrived, but Alex was there and gave Rilatos the bag containing marijuana that Hargrove had left for Rilatos to pick up. After Rilatos left the Hargrove apartment, she texted Townsend that the marijuana was "nothing but stems," in essence stating that they had been ripped off.

Townsend had Rilatos pick him up and take him to the Hargrove apartment. Rilatos went inside the apartment with Townsend. Multiple people were inside the apartment, including a man referred to as "Taco," who lived nearby and from whom Townsend had also bought drugs, and who Alex described as like a brother to her. Townsend confronted Hargrove about the disputed marijuana transaction. During their discussion, Townsend gave Hargrove the bag of marijuana, and Hargrove weighed it on a digital scale, revealing a weight of 13 grams. (An ounce is 28.3495 grams, so this weighing showed that the amount of marijuana that Townsend had in the bag was less than half of the full, $350 ounce that he had paid for.) Alex stated that she and Hargrove had not shorted Townsend on the transaction, called Rilatos a "dumb, fat, white bitch," and said that Rilatos had probably taken some of the marijuana that was purchased. Hargrove declined to return the purchase price ($350) in exchange for Townsend giving back the bag of marijuana. Townsend then challenged Hargrove to fight him. Hargrove initially declined, because Townsend was carrying a gun tucked in his waistband, but Townsend said he would get rid of it and handed the gun to Rilatos. The men went outside to fight.

A good-sized crowd of people — at least eight — watched the fight. The men grappled and traded punches, and, according to Hargrove, Hargrove seemed to have the upper hand. At one point however, Hargrove slipped in the snow, giving

Townsend the ability to get on top of him and begin choking him, at which point the later shooting victim, 15-year-old P.A., jumped on Townsend and punched him, in an attempt to get him off of Hargrove. Eventually, Townsend and Hargrove seemed to consider the matter sufficiently dealt with, and stopped fighting and separated. However, after the fight ended, Rilatos returned the gun to Townsend, who fired seven shots into the upper floor of the apartment building as he and Rilatos drove away.

The net result of this drug-deal-gone-bad is that at its conclusion, Townsend had been embarrassed and humiliated in multiple ways. He owed money to his girlfriend, Rilatos, who had spent $350 on his behalf, and now he was out $350 and had been ripped off by Hargrove and Alex. Further, Alex, in front of a group of people, both insulted Rilatos and accused her of taking some of the marijuana that was supposed to be Townsend's. Last, there was a fight where Townsend appeared to come out on the short end of it, again in front of multiple witnesses, and where minors piled on near the end. Townsend, even as a small-time drug dealer, was involved in a profession where a reputation for physical dominance is essential; as Townsend stated at trial, when a "deal[ was] going bad," he needed to "protect [him]self" instead of turning to the authorities. Having all of these things witnessed by multiple people was likely to be highly damaging to his reputation. In this milieu, these events were certainly sufficient to provide a solid motive for a revenge killing.

Burney's motive for participating in the offense was less clear, in that he had no known current connection to Hargrove or Alex, and no reason to have animosity towards them or their family. But the reporters that publish the decisions of our federal and state courts are full of cases where persons have willingly joined in to criminal endeavors where they had no personal stake in the encounter, and simply acted to assist a friend or acquaintance with the latter's criminal objectives, or did so to gain credibility in the criminal or gang milieu. As incomprehensible as such action is to the average person, the lack of a weightier motive on Burney's part did not substantially weaken the State's case, in that the evidence surrounding the shooting provided solid support

for the view that Burney intended to kill. Moreover, as noted immediately following, the evidence points to an agreement between Burney and Townsend; if a juror credited the existence of an agreement, they could also reasonably conclude that the less-motivated (in terms of direct motive to harm the victim) party to the agreement still decided to keep their end of the bargain.

There was evidence of an agreement between Burney and Townsend to engage in concerted criminal activity. At trial, the State played a recording of Detective Walter Gilmour interviewing West. West told Gilmour that at the party at her apartment, she heard "the boys" (*i.e.*, Townsend, Burney, and the other males at the gathering) in the kitchen talking about Townsend having been robbed, and that Burney and Townsend asked her to drive them to the location where that had taken place. At trial, West conceded that she had told police about overhearing Townsend say that he had been robbed, while claiming that Townsend did not directly say anything about retaliating against the people that had robbed him and that she just inferred that. But West testified to actions and statements by Burney and Townsend that suggested that they were attempting to conceal their actions or objectives and had a pre-existing agreement. As to concealment, West testified that:

- Burney was insistent that she drive him somewhere, but would not say where.

- When they left the apartment, Townsend told her that if she was later asked where they had gone, to say that the group was going to pick someone up.

- When they reached the Hargrove/Alex apartment building, Burney told her to stop the car, got out, and then told her to come around to the next street over (which is suggestive of a desire to avoid having the car spotted — in turn suggestive of the fact that he knew he was going to commit a criminal act when he got out of the car).

As to the fact of a pre-existing agreement, West testified that:

- Before she, Burney, and Townsend left her apartment, Burney turned to Townsend and said, "okay, let's go," and was not waiting for an

answer from Townsend (*i.e.*, Burney's statement was the launch signal to commence execution of their pre-existing agreement).

- Burney asked for a ride, but it was Townsend that gave her the directions to their destination.

- "[T]hey both knew what they were going over there for."

Moreover, West's own plea to manslaughter undoubtedly underscored for the jury that she acted culpably with respect to the duo's prospective actions. There was sufficient evidence of a tacit agreement between Burney and Townsend, at the time they left West's apartment, to engage in criminal activity. And they must have had the gun with them when they left the apartment, because the group did not stop anywhere between leaving the apartment and arriving at the location of the shooting.

The preceding facts regarding their tacit agreement do not themselves conclusively answer the question of whether Burney and Townsend's agreement was to try to kill a member of the Hargrove household, but they strongly suggest that they intended to commit criminal activity that involved a firearm. And it seems unlikely that the intent was simply to retaliate against Hargrove and Alex by shooting at their apartment building — Townsend had already done that. Thus, the jury could reasonably conclude that the intent was to shoot at a person.[13] Of course, it is theoretically possible that one could shoot merely with the intent to wound, not to kill. But, tying all of the foregoing discussion together, the most obvious basis for concluding that the agreement was to kill someone was the shooter's actions — firing six shots through a bedroom window at 3:00 a.m. in a manner that was highly likely to (and in fact did) result in a mortal wound to one of the persons in the bedroom.

---

[13] The Illinois Court of Appeals explained in a similar situation that a second, drive-by shooting into a residence, which hit a person inside, "clearly demonstrates that [the first drive-by's act of] merely shooting-up Jose's house was unsatisfactory," with "[t]he logical inference being that defendants intended [in the second drive-by] actual harm to the building's occupants, which, when automatic weapons are involved, may reasonably be interpreted as intent to kill." *People v. Hill*, 658 N.E.2d 1294, 1298 (Ill. App. 1995).

The majority suggests that evidence of Burney's intoxication undermines proof of his intent to kill. At trial, State of Alaska crime lab analyst Charles Foster testified that a blood sample was taken from Burney at 2:37 p.m. on April 1, 2014, approximately eleven hours after the shooting, which produced a reading of .029 grams of alcohol per 100 milliliters of blood. Foster testified that people metabolize alcohol at different rates, and that for people with slow metabolisms, their blood alcohol level would go down by .01 grams of alcohol per hour, while the average person metabolized at the rate of .017 grams per hour, while people with fast metabolisms eliminated alcohol at the rate of .025 grams per hour. Burney's counsel asked Foster to perform a retrograde extrapolation to calculate backwards as to what Burney's blood alcohol level could have been at the time of the shooting. Foster did so but did not expressly state a result. Townsend's counsel stated on cross-examination of Foster that Burney's counsel had followed along with Foster's calculations and came up with a result of .304 percent blood alcohol reading at the time of the shooting, assuming the highest elimination rate. (Doing the math reveals a blood alcohol reading of .216 percent using the average rate of elimination, and a reading of .139 percent using the lowest rate of elimination.) Foster conceded that .304 was the high possibility and that Burney's actual blood alcohol level would fall within a spectrum, depending on how fast he metabolized alcohol, which could in turn depend on how heavy a drinker he was in general, and how quickly he consumed the alcohol that evening, and when he stopped drinking.

In closing argument, Burney's counsel argued that given Burney's intoxication level (which he noted had to be based on a blood alcohol level between .15 and .3 percent), it was highly unlikely that Burney could have done everything necessary to commit the shooting, *i.e.*, walk from the car to the bedroom window on the snow-and-ice covered alley and fire six shots through a gap in the curtains, or that he formed the specific intent to kill.

These arguments did not substantially undermine the view that Burney could form the intent to kill and was capable of committing the shooting. The prosecutor

conceded in his rebuttal closing that Burney was intoxicated, noting that it was apparent from the tape of his first police contact when police officers stopped West's vehicle several minutes after the shooting, and from the fact that he still had a substantial amount of alcohol in his system when interviewed at the police station eleven hours later. But the prosecutor noted that Burney did a number of things reflective of his ability to deliberately move about and to make decisions. Burney participated in a conversation with Townsend at the party at West's apartment about Townsend recently having been ripped off by Hargrove, made a decision to leave the party with Townsend, walked downstairs and got in West's vehicle, was able to get out of the car at the Hargrove/Alex apartment and again when stopped by the police, and lied to the police when they stopped him. The prosecutor argued that "[t]his is not a person who's so drunk he's non-functional." The prosecutor asserted that it would have been obvious to Burney that the building he was shooting into was an apartment building, and also that the surface conditions of the alley (as seen in trial exhibits) would not have prevented an intoxicated person from walking to the apartment window. And the prosecutor concluded that emptying the entire magazine of the gun demonstrated the intent to kill.

The State's argument that Burney was not too intoxicated to commit the act of shooting into the bedroom window of the Hargrove/Alex apartment and to form intent to kill was consistent with Alaska case law. In *Simpson v. State*, the jury heard testimony that Simpson and his wife had spent the day drinking and had consumed three cases of beer, in addition to a pint of whiskey that Simpson drank himself.[14] The State's expert witness testified that people are capable of forming specific intent up until they reach a blood alcohol level where most people pass out, *i.e.*, around .35 percent.[15] This Court held that the jury could properly reject Simpson's claim that he was too

---

[14] *Simpson v. State*, 877 P.2d 1319, 1320 (Alaska App. 1994).

[15] *Id.* at 1321 n.1.

intoxicated to form intent to kill.[16] And in *Miller v. State*, retrograde extrapolation suggested that the two co-defendants could have had blood alcohol levels of .219 and .148 percent, respectively, but the jury rejected their claim that they could not form intent to kill.[17] In *Howell v. State*, Howell spent the evening drinking with friends, and his girlfriend accused him of being intoxicated when he returned home.[18] Based on that, Howell argued that he was too intoxicated to form intent to kill and argued that he simply "shot blindly and did not intend to kill."[19] We affirmed Howell's conviction, recognizing that the jury could properly reject this defense and that the circumstances of the shooting provided sufficient evidence that Howell intended to kill.[20] And Alaska's appellate courts have repeatedly recognized that arrestees and suspects may have sufficient mental capacity to waive various legal rights, despite being intoxicated.[21] The jury in this case had an ample basis to conclude that, despite his intoxication, Burney was sufficiently in possession of his mental faculties to form intent to kill. Moreover, his intoxication could also be viewed as explanatory of why he participated in this offense despite the lack of clear self-interest in doing so, *i.e.*, why he so willingly went along with Townsend's decision to seek further retribution against Hargrove and Alex.

---

[16]   *Id.* at 1320-21.

[17]   *Miller v. State*, 778 P.2d 593, 595, 597 (Alaska App. 1989).

[18]   *Howell v. State*, 917 P.2d 1202, 1204-05 (Alaska App. 1996).

[19]   *Id.* at 1212.

[20]   *Id.*

[21]   *Botson v. Municipality of Anchorage*, 367 P.3d 17, 25-26 (Alaska 2016) (citing and quoting *Gundersen v. Municipality of Anchorage*, 792 P.2d 673, 676-77 (Alaska 1990)); *Hampton v. State*, 569 P.2d 138, 142-44 (Alaska 1977).

The bottom line is that while it is fair to say that the State's case for first-degree murder was not overwhelming in that it depended in part on circumstantial evidence and some inferential reasoning, it is still the case that the record provided a sound basis from which a reasonable juror could conclude that the homicide in this case was intentional. In these circumstances, I disagree with the majority's conclusion that the supposed weakness of the State's case somehow suggests that the jury was pushed towards a first-degree murder conviction by the antagonistic defenses and the defense attorneys pointing the finger at each other's client. Rather, the evidence supported a first-degree murder conviction, and in my view the factor that likely helped to crystallize the jury's view of the facts were statements by Burney's counsel (discussed *infra*) recognizing that there was a central point upon which the case turned.

In this vein, a key factor that courts have noted in evaluating juries' ability to fairly adjudicate guilt among co-defendants is the relative complexity of a case.[22] That is to say, in cases of great complexity — whether that complexity stems from the number of defendants, the number of criminal counts, the complexity of the legal theories at issue in those counts, the sheer amount of physical or documentary evidence or number of witnesses, or some combination of all of these factors — the complexity may make it difficult for jurors to accurately attribute the evidence to the pertinent counts and defendant(s), and make it more likely that antagonistic defenses might prevent the jury from reliably adjudicating guilt. But at the same time, the Supreme Court has recognized that the ability of jurors in a joint trial to reliably evaluate the relative culpability of co-defendants may be enhanced "where . . . all the crimes charged against the joined defendants arise out of one chain of events, where there is a single victim, and where, in fact, the defendants are indicted on several of the same counts."[23]

---

[22] *See, e.g., United States v. Weckman*, 982 F.3d 1167, 1174 (8th Cir. 2020) (quoting *United States v. Nichols*, 416 F.3d 811, 817 (8th Cir. 2005)).

[23] *Buchanan v. Kentucky*, 483 U.S. 402, 418 (1987).

In other words, where the events surrounding a crime are not particularly complex, jurors should ordinarily not have undue difficulty in properly attributing evidence, even where co-defendants' defenses are antagonistic.

Here, there was a clear point of contention on which the case hinged and which focused the jury's deliberation. Specifically, surveillance video from a neighboring apartment building showed that only one man (not clearly identifiable) got out of West's vehicle and approached the apartment building, and the logical inference to be drawn was that the man was the shooter. The jury's determination of the identity of the shooter turned on whether the jury believed West's trial testimony that Burney was the man who got out of the vehicle. Burney's counsel emphasized this point in his closing argument. The final words of his summation were:

> And I break it down again, it's Karlie West. That's it. That's their case. That's his case. If you believe Karlie West, if she's the type of testimony that you would act without hesitation in your important affairs then you have to convict Lammar Burney of one of those levels of crime [manslaughter, second-degree murder, or first-degree murder]. If you don't, you have to acquit him. Thank you.

West's testimony was the crucial evidence that identified Burney as the shooter. The rest of the evidence provided the basis from which the jury could conclude that the shooting was not merely a reckless act but rather an intentional homicide. The majority's conclusion — that the jury's decision to convict Burney and Townsend of first-degree murder was likely influenced by the defense attorneys' finger-pointing at each other's clients, and that the defendants were thus unfairly prejudiced by the trial court's denial of their motions to sever — is unwarranted.

I conclude with a few thoughts about the standard that should be used in evaluating severance motions under Alaska Criminal Rule 14. Notwithstanding a 1991 legislative amendment that added additional language, Alaska Criminal Rule 14 is

based on and virtually identical to Rule 14 of the Federal Rules of Criminal Procedure.[24] Accordingly, although Alaska's courts are not strictly bound to adhere to federal courts' interpretation of analogous federal court rules,[25] we should follow them absent good cause not to. The overarching standard that we should thus apply was set out by the United States Supreme Court in 1993 in *Zafiro v. United States*, where the Court held that "[m]utually antagonistic defenses are not prejudicial *per se*" and that a "court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."[26] This standard is consistent with the common law standard for evaluating severance requests, where the decision whether to permit jointly charged defendants to be tried separately was vested in the sound discretion of the trial judge,[27] and where the essential condition mitigating in favor of separate trials is when "it appears that one or more of the defendants may be prejudiced by a joint trial."[28]

Additionally, in evaluating whether defenses are sufficiently antagonistic to warrant severance, the primary measure should be the evidence presented at trial, not the arguments of counsel, given the basic principle that the statements and arguments

---

[24]   *Cleveland v. State*, 538 P.2d 1006, 1008 n.3 (Alaska 1975).

[25]   *See, e.g.*, *Marron v. Stromstad*, 123 P.3d 992, 1004 (Alaska 2005) (evidence rules); *West v. Buchanan*, 981 P.2d 1065, 1070 (Alaska 1999) (rules of civil procedure); *Lewis v. State*, 565 P.2d 846, 851 (Alaska 1977) (rules of criminal procedure).

[26]   *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993).

[27]   *See United States v. Marchant*, 25 U.S. 480 (1827); *Ball v. United States*, 163 U.S. 662, 672 (1896) (citing *Marchant*, 25 U.S. at 485); 1 Joel P. Bishop, *Commentaries on the Law of Criminal Procedure* § 1018, at 632 & n.3 (2d ed. 1872) (citing cases).

[28]   *Commonwealth v. James*, 99 Mass. 438, 440 (1868).

of counsel are not evidence.[29] It is of course true that criminal defense counsel can articulate a defense in closing argument based solely on counsel's interpretation of the State's evidence — without the defense having called a single witness — and it is also the case that defense counsel is responsible for strategy. For these reasons, the arguments of counsel can be looked to in evaluating whether defenses are mutually antagonistic.[30] But giving primacy to the arguments and conduct of counsel in evaluating severance incentivizes bad behavior, and in any event jurors' predominant focus is the evidence. Accordingly, the trial evidence should be the primary measure of whether defenses are antagonistic. Here the trial evidence was not strongly mutually antagonistic.

Third, the majority opinion appears to strongly favor severance when defendants assert antagonistic defenses. I agree that trial judges enjoy broad discretion regarding severance, and should be less hesitant than they currently appear to be to grant severance when real prejudice to the rights of one or more co-defendants is apparent. Like my colleagues, I would not have reversed in this case had the trial judge opted to sever the cases. But I believe we should also heed the United States Supreme Court's long-standing recognition of the benefits of joint trials. Joint trials "conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial."[31] The Supreme Court has noted that "[j]oint

---

[29] *See, e.g.*, *United States v. Pérez-Vásquez*, 6 F.4th 180, 201 (1st Cir. 2021) ("Courts measure the level of antagonism by the evidence actually introduced at trial. And argument by counsel is not — repeat, <u>not</u> — evidence.") (quoting *United States v. Chisholm*, 940 F.3d 119, 128 (1st Cir. 2019)); *United States v. Lopez*, 649 F.3d 1222, 1237-38 (11th Cir. 2011); *Dancy v. United States*, 745 A.2d 259, 266 (D.C. App. 2000); *Commonwealth v. Vallejo*, 914 N.E.2d 22, 34 (Mass. 2009).

[30] *State v. Jaramillo*, 460 P.3d 321, 328 (Ariz. App. 2020) ("The contents of [opening statements and closing arguments] provide an indispensable context for evaluating whether co-defendants' cases are antagonistic.").

[31] *Bruton v. United States*, 391 U.S. 123, 134 (1968).

trials have long 'play[ed] a vital role in the criminal justice system,' preserving government resources and allowing victims to avoid repeatedly reliving trauma."[32] They "encourage consistent verdicts and enable more accurate assessments of relative culpability," and avoid a problem with separate trials, which "randomly favo[r] the last-tried defendants who have the advantage of knowing the prosecution's case beforehand."[33]

Last, I note that in 1991, the Alaska Legislature amended the rules regarding joinder and severance in two pertinent ways. The legislature added language to Alaska Criminal Rule 8(b), the rule regarding joinder of defendants for trial, providing that joinder is also warranted "if the defendants are parties to an express or tacit agreement to aid each other to commit an act or transaction constituting a criminal offense or offenses," the very situation presented by this case.[34] The legislature also added language to Alaska Criminal Rule 14 making clear that severance is only warranted if a defendant is "unfairly" prejudiced by joinder.[35] For these reasons, even in the situation of antagonistic defenses, a trial court's denial of a severance motion should not be reversed unless there is a genuine risk that one or more defendants were unfairly prejudiced by joint trial to such a degree that jury instructions were insufficient to address the concern. I do not find that to be the case here.

I concur fully with the majority's resolution of the appellants' claims related to the alleged jury-tampering incident and its effect on juror T.S.

---

[32] *Samia v. United States*, 599 U.S. 635, 654 (2023) (quoting *Richardson v. Marsh*, 481 U.S. 200, 209 (1987)).

[33] *Id.* (first citing *Bruton*, 391 U.S. at 143 (White, J., dissenting); then quoting *Richardson*, 481 U.S. at 210).

[34] SLA 1991, ch. 79, § 2.

[35] SLA 1991, ch. 79, § 3.